REPORTER'S RECORD

VOLUME 5 OF 12 VOLUMES

TRIAL COURT CAUSE NO. 114-0648-13

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
6/24/2014 4:26:00 PM
CATHY S. LUSK
Clerk

| | |
|---|---|
| STATE OF TEXAS | ) IN THE DISTRICT COURT |
| | ) |
| | ) |
| | ) |
| VS. | ) SMITH COUNTY, TEXAS |
| | ) |
| | ) |
| | ) |
| JOSEPH PIERCE | ) 114TH JUDICIAL DISTRICT |
| | ) |
| | ) |

*********************************************************

PRETRIAL & HEARING ON MOTION TO SUPPRESS

*********************************************************

On the 21st day of October, 2013, the following proceedings came on to be heard in the above-styled and -numbered cause before the HONORABLE CHRISTI J. KENNEDY, Judge Presiding, held in Tyler, Smith County, Texas:

Proceedings reported by Computerized Machine Stenography, Reporter's Record produced by Computer-Assisted Transcription.

Court Reporter: CASSIE CONDREY.
             Texas CSR #9035
             Official Court Reporter
             114th Judicial District Court
             212 Smith County Courthouse
             Tyler, Texas 75702
             (903) 975-4331

1              A P P E A R A N C E S

2

3    FOR THE STATE:
         Mr. Jacob Putman
4        SBOT NO.:  24065929
         Smith County District Attorney's Office
5        100 North Broadway Avenue
         Fourth Floor
6        Tyler, Texas  75702
         Telephone: (903) 590-1713

7

8    FOR THE STATE:
         Mr. Christopher Gatewood
9        SBOT NO.:  24062488
         Smith County District Attorney's Office
10       100 North Broadway Avenue
         Fourth Floor
11       Tyler, Texas  75702
         Telephone: (903) 590-1720

12

13   FOR THE DEFENDANT:
         Mr. Jason A. Ellis
14       SBOT NO.:  24052915
         Law Offices of Jason A. Ellis
15       120 South Broadway Avenue
         Suite 109
16       Tyler, Texas  75702
         Telephone:  (903) 705-6236

17

18

19

20

21

22

23

24

25

1                          INDEX

2

3    Appearances                                    2

4    JEREMY FRAZIER

5        Direct Examination by Mr. Putman          10

6        Cross-Examination by Mr. Ellis            49

7    Reporter's Certificate                        79

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  Cause number 114-0648-13.

3    State of Texas versus Joseph Pierce.  Counsel for the

4    State, counsel for the defendant and the defendant are

5    present in the courtroom.

6              State's ready?

7              MR. PUTMAN:  We're ready, Your Honor.

8              THE COURT:  Defense is ready?

9              MR. ELLIS:  Ready, Your Honor.

10             THE COURT:  All right.  Mr. Ellis?

11             MR. ELLIS:  Yes.

12             THE COURT:  Mr. Pierce, would you come up

13   here with Mr. Ellis, please?

14             THE DEFENDANT:  Yes, ma'am.

15             THE COURT:  Mr. Ellis, I know you got into

16   this case a little later.  Have you received the State's

17   felony discovery compliance form?

18             MR. ELLIS:  Yes, Judge.

19             THE COURT:  You've had plenty of time to

20   review the discovery?

21             MR. ELLIS:  Yes, I have, Your Honor.

22             THE COURT:  You don't have any reason to

23   believe there's any discovery missing?

24             MR. ELLIS:  No, Your Honor.

25             THE COURT:  You've received the State's

1 notice of intent to offer evidence under 404 (b), 609

2 and 37.07?

3          MR. ELLIS:  Yes, Your Honor.

4          THE COURT:  No issues relating to that

5 notice?

6          MR. ELLIS:  No, your Honor.

7          THE COURT:  You've received the State's

8 motion for notice of defense expert?

9          MR. ELLIS:  Yes, I have, Your Honor.

10          THE COURT:  Any opposition?

11          MR. ELLIS:  No, your Honor.

12          THE COURT:  Motion's granted.

13          You've received the State's notice of

14 intent to call expert?

15          MR. ELLIS:  Yes, Your Honor.  No objection.

16          THE COURT:  No issues relating to that

17 notice?

18          MR. ELLIS:  No.

19          THE COURT:  And the State's response to the

20 request to list witness.  Same?  No issues related to

21 that?

22          MR. ELLIS:  No issues.

23          THE COURT:  State's motion to obtain

24 fingerprints of the defendant.  Any opposition to that

25 motion?

```
 1                    MR. ELLIS:  No, your Honor.

 2                    THE COURT:  It's granted.

 3                    State's motion in limine.  Any opposition

 4   to that as an in limine order only?

 5                    MR. ELLIS:  No, your Honor.

 6                    THE COURT:  That motion's granted as well.

 7                    Is there any additional pretrial from the

 8   State?

 9                    MR. PUTMAN:  Your Honor, we filed two

10   supplemental notices of witnesses.  Both are parole

11   officers from Louisiana.

12                    THE COURT:  You received that information,

13   Mr. Ellis?

14                    MR. ELLIS:  Yes, I have, Your Honor.

15                    THE COURT:  No issues relating to those

16   notices?

17                    MR. ELLIS:  No, your Honor.

18                    THE COURT:  All right.  Have you filed any

19   other pretrial motions besides the motion to suppress?

20                    MR. ELLIS:  No, your Honor.

21                    THE COURT:  Are you requesting to take the

22   motion to suppress up prior to trial?

23                    MR. ELLIS:  Yes, Your Honor.

24                    THE COURT:  All right.

25                    In the event the Court grants the motion to
```

1  suppress, would that be dispositive of the case?

2            MR. PUTMAN:  It would, Your Honor.

3            THE COURT:  If the Court denies it, you're

4  still planning to proceed to trial?

5            MR. ELLIS:  No, your Honor.

6            THE COURT:  You're not planning to proceed

7  to trial?

8            MR. ELLIS:  Can I have a moment,

9  Your Honor?

10            THE COURT:  You may.  I kind of need to let

11  the case behind you know what we're doing.

12            MR. ELLIS:  Your Honor, I believe you asked

13  if it would be dispositive if the Court denied the

14  motion to suppress.  It is our understanding that it

15  will be dispositive.

16            THE COURT:  That's not what I asked.  I

17  said would you still be proceeding to trial or would you

18  enter a guilty plea subject to the Court's ruling on the

19  motion to suppress?

20            MR. ELLIS:  If the Court denied the motion

21  to suppress, we would be entering a guilty plea.

22            THE COURT:  Thank you.

23            All right.  Then we'll take up the motion

24  to suppress as soon as we make it through a few things

25  here.  I don't think it will be much more than

1    30 minutes before we get to you.

2                   MR. ELLIS:  Thank you.

3                   THE COURT:  Thank you.

4                   (Recessed.)

5                   THE COURT:  All right.  Back on the record

6    in cause number 114-0648-13.  State of Texas versus

7    Joseph Pierce.  Counsel for the State, counsel for the

8    defendant and the defendant are present in the

9    courtroom.

10                   Is the State ready on the motion to

11   suppress?

12                   MR. PUTMAN:  We are, Your Honor.

13                   THE COURT:  Defense ready?

14                   MR. ELLIS:  Yes, Your Honor.

15                   THE COURT:  All right.

16                   Mr. Putman, was this a stop without the

17   benefit of a warrant?

18                   MR. PUTMAN:  Yes, Your Honor.  We would

19   stipulate to the fact that there was a stop and a search

20   of the vehicle without a warrant.

21                   THE COURT:  All right.  And so we'll be

22   looking to you to satisfy the burden?

23                   MR. PUTMAN:  Yes, Your Honor.

24                   THE COURT:  All right.  You may proceed.

25                   MR. PUTMAN:  Your Honor, the State would

1  call Jeremy Frazier.

2           (Witness approaches the witness stand.)

3           MR. ELLIS:  Your Honor, at this time we'll

4  invoke the rule of witnesses.

5           THE COURT:  All right.  If you're a witness

6  in the State of Texas versus Joseph Pierce, if you would

7  please wait outside.

8           You'll be required to stay outside of the

9  hearing of this testimony today and we'll call you when

10 we need you as a witness.  Please don't discuss your

11 testimony with any other person.  I'm also going to

12 swear you as witnesses.  Please raise your right hands

13 to be sworn.

14          Do you solemnly swear or affirm to tell the

15 truth, the whole truth and nothing but the truth so help

16 you God?

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  And you, ma'am?

19          THE WITNESS:  Yes, ma'am.

20          THE COURT:  All right.  And your name, sir?

21          THE WITNESS:  Jeremy Frazier.

22          THE COURT:  Thank you.

23          And you, ma'am?

24          THE WITNESS:  Marlena Adams.

25          THE COURT:  And you, sir?

1    THE WITNESS:  Josh Hill.

2    THE COURT:  All right.  Thank you.

3    If you witnesses, then, would remain

4  outside during Trooper Frazier's testimony.  Thank you.

5    (Witnesses leave the courtroom.)

6    THE COURT:  You've already been sworn.

7  Please have a seat.

8    THE WITNESS:  Yes, ma'am.  Thank you.

9    THE COURT:  Mr. Putman, your witness.

10                  DIRECT EXAMINATION

11  BY MR. PUTMAN:

12    Q.  Trooper Frazier, how are you currently

13  employed?

14    A.  I'm a trooper with the Texas Department of

15  Public Safety.

16    Q.  And how long have you been a trooper there?

17    A.  Approximately 3 years.

18    Q.  And are you a certified peace offer?

19    A.  Yes, sir.

20    Q.  How long have you been a certified peace

21  officer?

22    A.  Approximately 3 years.

23    Q.  What kind of training and, you know, education

24  have you had regarding being a police officer and a

25  state trooper?

1    A.    Extensive training as far as DWI goes.

2  Training for DWI, training for criminal and drug

3  interdiction, training for crash investigations, things

4  like that.

5    Q.    When you were hired on as a trooper, did you go

6  to the DPS Academy for all troopers?

7    A.    Yes, sir.

8    Q.    How long was that?

9    A.    Approximately 4 and a half, 5 months.

10   Q.    And what kinds of things did you learn there?

11   A.    Patrol procedure, (inaudible) violator contact,

12  know how to approach a vehicle, DWI and field sobriety

13  testing.

14   Q.    Have you had any specific schools or training

15  since the academy with DPS?

16   A.    Yes, sir.

17   Q.    Could you tell us what those are?

18   A.    ARIDE, which is Advanced Roadside Impairment

19  Training for DWI, several criminal drug interdiction

20  classes, interview and interrogation classes.  That's

21  all -- all I recall off the top of my head.

22   Q.    What is drug interdiction.  You said you had

23  classes on that.  What does that mean?

24   A.    Criminal drug interdiction is basically

25  detecting -- stopping somebody on the side of the road

1   and going past your routine traffic stop and seeing if

2   there's something further past the traffic stop, whether

3   it be illegal drugs, currency procedures, missing or

4   exploited children, human smuggling, things of that

5   nature.

6          Q.   What specific training have you had regarding

7   drug -- or interdiction?

8          A.   I've been to numerous HIDTA classes.

9          Q.   What does that stand for?

10         A.   I couldn't tell you right now, sir.

11         Q.   What is it?

12         A.   Highway interdiction.  It's an interdiction

13  class.

14         Q.   Okay.  And how many of those classes have you

15  been to?

16         A.   Approximately three in the past year.

17         Q.   And any other training regarding interdiction

18  or drug interdiction?

19         A.   I've been to -- I think one has been a --

20  Desert Snow class, which is another program, but I can't

21  recall exactly if that was -- who sponsored it or not.

22         Q.   And you said you've had classes regarding

23  impaired drivers; is that right?

24         A.   Yes, sir.

25         Q.   What classes have you had regarding those

1  things?

2      A.    We do a field sobriety refresher class once a

3  year.  I've been to that.  I've also been to the

4  advanced -- ARIDE, which is the Advanced Roadside

5  Impairment Program, which is something that goes past

6  the normal alcohol DWI and leans more towards DWI due to

7  drugs.

8      Q.    And how long was the ARIDE course?

9      A.    I believe it's a week.

10      Q.    And that's for the impaired driving on things

11  other than alcohol; is that what you said?

12      A.    Yes, sir.  That's correct.

13      Q.    Any other training and experience you've had

14  regarding interdiction stops or impaired drivers?

15      A.    Off the top of my head, no.

16      Q.    As a Trooper, you work the highways of the

17  State of Texas; is that right?

18      A.    Correct.

19      Q.    Mainly going about enforcing the laws through

20  traffic laws; is that correct?

21      A.    Correct sir.

22      Q.    You've had training in the Penal Code and the

23  traffic -- Transportation Code?

24      A.    Yes, sir.

25      Q.    And you're familiar with the offenses there and

1  you spend a lot of time on the highway; is that right?

2      A.   Yes, sir.

3      Q.   What's your jurisdiction?  Where are you

4  currently assigned?

5      A.   I'm assigned to Smith County.

6      Q.   And how long have you been in Smith County?

7      A.   Just over 2 years.

8      Q.   When you're working in Smith County, do you

9  work in specific areas in Smith County or how does that

10 work?

11     A.   We don't have a specific area that we're

12 assigned to.  Just the county and so --

13     Q.   How --

14     A.   -- wherever we want to work, kind of.

15     Q.   How do you decide where you're going to work on

16 a particular day?

17     A.   Just kind of wherever I feel like working that

18 day.

19     Q.   Okay.  Were you working as a Trooper for the

20 Department of Public Safety on February 22nd of this

21 year?

22     A.   Yes, sir.

23     Q.   And do y'all work a shift?

24     A.   Yes, sir.

25     Q.   What shift were you working back in February;

1  do you remember?

2      A.   I'll have to refer to my case report.

3      Q.   Did you bring your report with you?

4      A.   Yes, sir.

5      Q.   And you prepared this report; is that correct?

6      A.   That's correct, sir.

7      Q.   And why did you prepare the report?

8      A.   It's required on all arrests.

9      Q.   Does referring to it help to refresh your

10 memory?

11     A.   Yes, sir.  It does.

12     Q.   If you need to refer to it to refresh your

13 memory, you can.

14              When were you working on February 22nd?

15     A.   I was working a shift from 12:00 p.m. to

16 1:00 a.m.

17     Q.   12:00 p.m. to 1:00 a.m.?

18     A.   Yes, sir.

19     Q.   So that's the afternoon up until just past

20 midnight?

21     A.   Yes, sir.

22     Q.   And where were you working that day?

23     A.   Interstate 20.

24     Q.   And does a portion of Interstate 20 pass

25 through Smith County?

1      A.   Yes, sir.

2      Q.   And were you working on that portion of

3  Interstate 20?

4      A.   Yes, sir.  I was.

5      Q.   When you're working the interstate, what kind

6  of things do you do?

7      A.   We do -- we stop, obviously, for traffic

8  violations, do crash investigations.  We have a lot of

9  crashes on the interstate and also DWIs because we have

10  a lot of them going back and forth from the casinos in

11  Louisiana.  So that's something we do there also.

12      Q.   When you are up on the interstate and you're

13  not actively -- you don't have someone pulled over and

14  you're waiting, I guess, what do you do?  I mean, are

15  you sitting still, are you driving, what do you do?

16      A.   We do both.  Sometimes we work patrol moving

17  and sometimes we'll sit still on the shoulder of the

18  road.  So we do both.

19      Q.   Is there advantages and disadvantages of the

20  two different ways to do it?

21      A.   Yes, sir.  There are advantages and

22  disadvantages to both.

23      Q.   Why would you sit still?  What's the purpose of

24  that?

25      A.   It's easier to not -- to see equipment

1  violations, as far as headlights being out, things like

2  that.

3           Also it's easier for me to detect, you

4  know, if somebody's impaired when they drive by, rather

5  than me just driving and only getting a glimpse of the

6  car for half a second.

7       Q.   I guess if you're driving on the interstate,

8  you have the cars that are moving with you?

9       A.   Yes, sir.

10      Q.   And then you have the ones moving the opposite

11  direction?

12      A.   Yes, sir.

13      Q.   The ones going in the opposite direction, hard

14  to see them for very long?

15      A.   Correct.

16      Q.   And the ones moving with you, you're not seeing

17  that many different cars?

18      A.   Correct.

19      Q.   Because they're moving along with you?

20      A.   Correct, sir.

21      Q.   If you're sitting still, a lot of cars pass

22  you?

23      A.   Yes, sir.

24      Q.   The night of the 22nd, what were you doing?

25  Were you driving with traffic or sitting still?

1     A.   I was sitting still.

2     Q.   And do you recall where you were on the

3 interstate; where you were sitting?

4     A.   Yes, sir.

5     Q.   Where were you?

6     A.   I was on the eastbound side of the Interstate

7 sitting at the scale house.

8     Q.   And you said sitting at the scales?

9     A.   Yes, sir.

10     Q.   What does that mean?

11     A.   It's where we have our commercial

12 motor vehicles pull over so we can weigh the trucks.

13     Q.   So a place you can kind of pull off the

14 Interstate and get back on?

15     A.   Yes, sir.  It's a place we use that's a little

16 bit safer for us.  That way we're not right next to the

17 interstate, right on top of the road.  And it will

18 provide a little bit more of a buffer for us so if

19 somebody was to drive by intoxicated and hit our car.

20     Q.   Safer than sitting on the shoulder?

21     A.   Yes, sir.

22     Q.   And when you're sitting there by the scales,

23 are you facing the direction of traffic, against

24 traffic, or perpendicular?  How are you --

25     A.   I was facing sideways.  That way I could see

1  the traffic that was coming towards me and after they

2  passed me.

3      Q.    So sideways -- the hood of your car was facing

4  what direction?

5      A.    It was facing northbound.

6      Q.    Okay.  And I 20 travels what direction?

7      A.    It travels east and westbound.

8      Q.    Okay.  So the cars drive by in front of you?

9      A.    Yes, sir.

10      Q.    Does your patrol car that you drive, does it

11  have recording equipment in it?

12      A.    Yes, sir.  It does.

13      Q.    What kind of equipment does it have?

14      A.    It has a WatchGuard video camera.

15      Q.    And what -- where is that camera in the car?

16      A.    It's mounted on the windshield of my patrol

17  car.

18      Q.    And which direction does it face?

19      A.    It faces forward.

20      Q.    Forward -- so forward out the windshield?

21      A.    It's faced towards my windshield.  But it also

22  has a cabin camera that can be switched so you can see

23  inside the vehicle.

24      Q.    Okay.  So it will either shoot in front of the

25  car or inside the car?

1    A.   Yes, sir.  That's correct

2    Q.   Is it able to capture the peripheral of the

3 car, you know, out the driver's side window or passenger

4 side window?

5    A.   Not out the side windows, but it does get a

6 pretty good peripheral view of the --

7    Q.   Out the front?

8    A.   Yes, sir.

9    Q.   Just not out the sides?

10    A.   Correct.

11    Q.   Was your camera working the night of February

12 22nd?

13    A.   Yes, sir.

14    Q.   And have you had an opportunity to review the

15 recording from your patrol car that night?

16    A.   Yes, sir.  I have.

17         MR. PUTMAN:  May I approach the witness,

18 Your Honor?

19         THE COURT:  You may.

20    Q.   (BY MR. PUTMAN)  Trooper, I'm going to show you

21 what I've marked as State's 1S.  The camera that you

22 had, was it working properly?

23    A.   Yes, sir.

24    Q.   And is it able to record audio/voices?

25    A.   Yes, sir.  It does.

1    Q.   And how does it do that?

2    A.   I have a body mic on my belt so when I approach

3 the vehicle it picks that up.

4    Q.   You've had an opportunity to review State's 1S

5 and listen to the voices that are heard on the tape?

6    A.   Yes, sir.

7    Q.   On the recording.  It's a DVD; it's not tape.

8         But you've listened to the recording and

9 seen it.  Is it an accurate recording of what happened

10 that night?

11   A.   Yes, sir.  It is.

12   Q.   And are you able to recognize the voices and

13 the people that appear on that video?

14   A.   That's correct.

15        MR. PUTMAN:  Your Honor, we'd offer State's

16 1S for purposes of this hearing.

17        MR. ELLIS:  No objection.

18        THE COURT:  State's 1S is admitted for

19 purposes of this hearing.

20        MR. PUTMAN:  Permission to publish,

21 Your Honor?

22        THE COURT:  You may.

23   Q.   (BY MR. PUTMAN)  Trooper Frazier, if you would

24 touch the bottom left corner on the screen, it will

25 actually clear those arrows off.  You have to actually

1   touch on the screen right in the corner.  There you go.

2               (State's Exhibit 1S published.)

3       Q.   (BY MR. PUTMAN)  All right.  Where are we

4   looking at the screen we're looking at here?

5       A.   That's the eastbound side of Interstate 20.

6       Q.   So you're facing the interstate, cars are

7   driving by across the screen in front of us?

8       A.   Correct, sir.

9       Q.   Is this where you were sitting?

10      A.   Yes, sir.

11      Q.   Do you recall about what time it was where this

12  video picks up where we're here on the interstate?

13      A.   No, sir.  I don't.

14      Q.   It's dark outside; is that right?

15      A.   Yes, sir.  It is.

16      Q.   Nighttime?

17      A.   Yes, sir.

18      Q.   And I think you said you work the 12:00 p.m. to

19  1:00 a.m. shift?

20      A.   Correct.

21      Q.   So this would be later in your shift?

22      A.   Yes, sir.  It is.

23      Q.   Okay.  As cars are driving by, what are you

24  looking for?

25      A.   I'm looking for several things.  Equipment

1  violations, head lights, taillights, erratic driving,
2  things like that.
3      Q.   Trooper, I think -- I believe on the software
4  that's playing here you can see the count at the bottom;
5  is that right?
6      A.   Yes, sir.
7      Q.   That's not the time.  It's counting the minutes
8  and seconds that go by?
9      A.   Correct, sir.
10     Q.   Okay.  Trooper, the counter says about 3:17 and
11 you've now pulled onto the interstate, correct?
12     A.   Correct.
13     Q.   Why did you pull onto the interstate at that
14 time?
15     A.   I noticed the car that drove by me.  And when
16 the car went by, I noticed that it crossed over that
17 white line.
18     Q.   Which white line are you talking about?
19     A.   The one on the right-hand side.
20     Q.   That line divides what?
21     A.   The Interstate from the shoulder.
22     Q.   Okay.  So the car you saw, did it drive on the
23 white line or did cross over into the shoulder?
24     A.   It crossed over.  Its tires cleared the white
25 line.

1       Q.   And drove onto the shoulder?

2       A.   Yes, sir.

3       Q.   Is that a traffic violation?

4       A.   Yes, sir.  It is.

5       Q.   And then you turned on to the interstate to get

6    behind that car?

7       A.   Yes, sir.

8       Q.   Are you about to initiate a traffic stop on

9    that vehicle?

10      A.   Yes, sir.

11      Q.   All right.  Trooper, to be clear, the car that

12   you saw driving on the shoulder, can you see that car in

13   the video now?

14      A.   Yes, sir.  It's the vehicle on the right-hand

15   side.

16      Q.   In the right lane there?

17      A.   Yes, sir.

18      Q.   And you're in the left lane?

19      A.   Yes, sir.

20      Q.   And what direction of travel are y'all heading?

21      A.   Eastbound.

22      Q.   Eastbound?

23      A.   Yes, sir.

24      Q.   And in Smith County, if you're eastbound on

25   I 20, you're headed towards what state?

1      A.    Louisiana.

2      Q.    Okay.  This car, is that the car you saw drive

3  on the shoulder?

4      A.    Yes, sir.

5      Q.    Were you able to see it drive on the shoulder

6  in the video?

7      A.    At what point?

8      Q.    Before you pulled behind them.

9      A.    No, sir.

10     Q.    I'm guessing you pulled in behind the vehicle,

11 correct?

12     A.    Yes, sir.

13     Q.    Before you pulled in behind the vehicle, is

14 that when you saw them drive on the shoulder?

15     A.    I saw two different -- I'm not sure exactly

16 what you're asking.  I saw it at two different points.

17           When the vehicle was approaching me, it

18 crossed over the -- when it was just passing the

19 structure--which you can't see--of the scale house, it

20 crossed over the shoulder and that's the reason why I

21 pulled out on to the interstate.

22           Once I was coming up behind the vehicle, it

23 rode on top of the white line, which is still driving on

24 the improved shoulder, which is still a traffic

25 violation, so it was actually two different times.

1     Q.   Okay.  So the part where it actually crossed

2 over the line was by the scale house?

3     A.   Yes, sir.

4     Q.   And we couldn't see the scale house on the

5 video?

6     A.   Correct, sir.

7     Q.   Because we're not -- the video is not facing

8 that direction?

9     A.   Correct.

10     Q.   But obviously, if you turned your head, you

11 could see it?

12     A.   Yes, sir.

13     Q.   All right.  Trooper, y'all come to a stop

14 behind that vehicle; is that right?

15     A.   Yes, sir.

16     Q.   Can you tell us the time on the counter there

17 at the bottom?

18     A.   4 minutes and 56 seconds.

19     Q.   Trooper, we heard you ask, "Have you had

20 anything to drink?"  Why were you asking that?

21     A.   Because of their driving behavior.

22     Q.   What was significant about the driving behavior

23 to you?

24     A.   Just the fact that they had crossed over the

25 shoulder several times.

1    Q.   Were you suspicious of anything when you first

2    pulled them over other than the traffic offense?

3    A.   Of DWI.  Yes, sir.  Just suspicious of it.

4    Q.   That's why you asked about drinking?

5    A.   Correct, sir.

6    Q.   And you approach on the passenger side of the

7    vehicle stopped here on the shoulder of I 20?

8    A.   Yes, sir.

9    Q.   And why did you do that?

10   A.   Because there's a lot of intoxicated drivers on

11   the road and they will tend to look at lights.  And when

12   they tend to look at lights, they tend to hit us.

13        So I moved to the passenger side just to

14   give myself a place to get away so I don't get smashed

15   between two cars.

16   Q.   Safer on that side?

17   A.   Yes, sir.

18   Q.   Okay.  And you asked for their identification;

19   is that right?  Driver's license?

20   A.   Yes, sir.

21   Q.   Trooper Frazier, what -- you've asked for a

22   license.  About 30 seconds to a minute has gone by.

23   What's happening now?

24   A.   I asked him for his driver's license.  He told

25   me that his driver's license had been suspended.  I

asked him for proof of insurance and the passenger

provided that.  So right now, basically, I'm going

through the process of trying to figure out what the

deal with his driver's license is and waiting for the

insurance.

Q.   Who was in the car when you walked up to the

passenger side?

A.   Marlena Adams.

Q.   She was sitting where in the car?

A.   Front passenger seat.

Q.   And who else was in the car?

A.   Mr. Pierce.

Q.   And where was Mr. Pierce seated?

A.   In the driver's seat.

Q.   Anybody else in the car besides the driver and

the passenger?

A.   No, sir.

Q.   Do you see the driver of the vehicle in court

today?

A.   Yes, sir.

Q.   Could you point to him and tell me what he's

wearing?

A.   Purple shirt.

        MR. PUTMAN:  Ask the record reflect the

witness has identified the defendant.

1          THE COURT:  The record shall so reflect.

2      Q.  (BY MR. PUTMAN)  Is there anything unusual

3  about what's going on in the car while you're standing

4  there?

5      A.  Yes, sir.  There is.

6      Q.  What did you notice that you thought was

7  unusual?

8      A.  When I approach a vehicle -- well, Mr. Pierce

9  automatically told me that his driver's license was

10  suspended, which isn't incredibly unusual.

11          But a lot of times when people are overly

12  nice, it tends to raise my suspicion a little bit.  And

13  also they both seemed to be really nervous.

14      Q.  So Mr. Pierce told you initially that his

15  driver's license was suspended?

16      A.  Yes, sir.

17      Q.  First thing he told you?

18      A.  Yes, sir.

19      Q.  Is that an offense in the State of Texas that

20  someone could be arrested for?

21      A.  Yes, sir.  It is.

22      Q.  Okay.  And after he told you that, then what

23  happened next?

24      A.  I asked for the insurance.  Ms. Adams was

25  looking for that, kind of going through her purse or

1  some paperwork in the console, trying to find the

2  insurance.  And that's what I'm waiting on right now.

3        Q.    Okay.

4        A.    I believe I asked her for her -- I don't

5  remember if it was at this point or another.  I asked

6  her for her ID to make sure I had a licensed driver in

7  the vehicle is the reason I asked for her ID also.

8        Q.    Trooper Frazier, is Ms. Adams able to get some

9  documents out of the glove box?

10       A.    Yes, sir.  She was able to get the insurance

11  out of the glove box.

12       Q.    Anything unusual about that?

13       A.    Yes, sir.  Very unusual.  Her hands were

14  shaking extremely bad whenever she went to the glove box

15  and handed me the insurance card.

16       Q.    You work the highways of the State of Texas?

17       A.    Yes, sir.

18       Q.    Pull over lots of people?

19       A.    Yes, sir.

20       Q.    People usually nervous when you pull them over?

21       A.    A little bit sometimes.

22       Q.    And in your training and experience, was

23  Ms. Adams the usual amount of nervous when you pull

24  somebody over?

25       A.    No, sir.  She was overly nervous.

1      Q.   And what indicated that to you?

2      A.   The extreme shaking of her hands.

3      Q.   Her hands were shaking noticeably?

4      A.   Yes, sir.  Noticeably.

5      Q.   And I think we heard you say you wanted

6  Mr. Pierce to get out of the car?

7      A.   Yes, sir.

8      Q.   Why is that?

9      A.   He didn't -- he had asked me a question about

10  the suspension of his driver's license.  So rather than

11  me going back and forth and walking back and forth

12  between the cars and risk getting hit, it was cold

13  outside, so I was just going to have him sit back in my

14  car with me.  That way I can ask him the questions and

15  try to figure out what the suspension -- or if his

16  driver's license was suspended.

17      Q.   Try to further investigate --

18      A.   Yes, sir.

19      Q.   -- whether his license was suspended or not?

20      A.   Yes, sir.

21      Q.   Okay.

22      A.   Correct.

23      Q.   Did you notice anything about Ms. Adams' or

24  Mr. Pierce's appearance while you were talking to them?

25      A.   Yes, sir.  I did.

1     Q.   What did you notice?

2     A.   I noticed they were both -- had lots of sores

3  on them, which is common with methamphetamine use.

4     Q.   And how do you know that?

5     A.   From my training and experience.

6     Q.   And where did you observe sores?

7     A.   On their face and on their arms.

8     Q.   Okay.  Trooper Frazier, you were just checking

9  his pockets and his waistband; is that right?

10    A.   Yes, sir.

11    Q.   Why did you do that?

12    A.   To make sure he didn't have any weapons, any

13 guns or knives, on him before I put him in my vehicle.

14    Q.   Why were you sitting him in your vehicle?

15    A.   So I could ask him the questions for his

16 driver's license -- about his driver's license.

17    Q.   Why not just ask him on the side of the road?

18    A.   Because it's safer in my car and also it was

19 cold and windy outside.

20    Q.   Could you -- on the video -- could you describe

21 what Mr. Pierce is wearing?

22    A.   Black T-shirt and blue jeans.

23    Q.   And what's the concern?  I mean, why do you

24 need to check his pockets if you're going to put him

25 inside of your car?

     A.   Because we're within arms' reach of each other
and if he had a pocket knife in his pocket, he could
just open it up and literally just stab me or, you know,
hurt me.

     Q.   So that's a concern because he's going to be
closer to you inside of your vehicle?

     A.   Correct.  Yes, sir.

     Q.   And the parts on Mr. Pierce that you checked
before he sat in your car, what areas of him did you
check?

     A.   His pockets and his waistband, which are common
for people to carry weapons on.

     Q.   Blue jean pockets?

     A.   Yes, sir.

     Q.   Did he have any weapons on him?

     A.   No, sir.  He did not.

     Q.   Trooper Frazier, where did Mr. Pierce say they
were coming from?

     A.   I believe they said they were coming from -- I
don't recall if it was her family or his family.

     Q.   Okay.  If you need to refresh your memory with
your report, you can.

     A.   Okay.  He stated that he was -- they were
coming from her -- Ms. Adams' cousin's house and headed
home to Louisiana.

```
1      Q.   So from Ms. Adams' cousin's house to Louisiana?
2      A.   Correct, sir.
3      Q.   All right.  Trooper Frazier, you asked
4   Mr. Pierce about if he had ever been arrested before?
5      A.   Yes, sir.
6      Q.   What was his response to that question?
7      A.   He said, "Yes, sir.  I have."
8      Q.   Did he tell you what he had been arrested for?
9      A.   He went through several things.  Yes, sir.
10      Q.   Can you tell us what those things are?
11      A.   If it's not in the report -- I'll check and see
12   if it's in the report.  I had a hard time understanding
13   what he was saying in the video.
14      Q.   Okay.  Can you describe Mr. Pierce's demeanor
15   while he's siting in the car?  Obviously, we can't see
16   him in the video right now.  He's sitting on the front
17   passenger seat next to you?
18      A.   Yes, sir.
19      Q.   Is he handcuffed?
20      A.   No, sir.  He's not.
21      Q.   Is he arrested at that time?
22      A.   No, sir.  He's not.
23      Q.   What's his demeanor like while he's sitting
24   next to you?
25      A.   He's nervous and fidgeting around.  Having a
```

1  hard time sitting still.

2     Q.   And you say nervous.  What indicated to you

3  that he was nervous?

4     A.   The way he was answering the questions.  The

5  way he was moving around.  His eyes were moving around a

6  bunch.  Those are the biggest things.

7     Q.   Did his -- the way he was fidgeting around and

8  moving, did that make you suspicious of anything?

9     A.   Yes, sir.  It's also one of the effects of

10  methamphetamines.  It's -- somebody can't sit still and

11  is constantly fidgeting.

12     Q.   And what training have you had regarding the

13  effects of methamphetamines on how somebody acts?

14     A.   The ARIDE class that I went to.  The Advanced

15  Roadside Impairment.

16     Q.   Trooper Frazier, you asked Mr. Pierce a series

17  of questions about illegal things in the vehicle?

18     A.   Yes, sir.

19     Q.   And I think it was guns, marijuana, things like

20  that?

21     A.   Yes, sir.

22     Q.   Did you ask those things in a specific order?

23     A.   Yes, sir.  I did.

24     Q.   And how did you ask those?

25     A.   I asked marijuana, guns, drugs, large sums of

1  cash.  And I asked -- specifically asked methamphetamine

2  last because I wanted to see his reaction to me asking

3  him that question.

4       Q.   Okay.  Why did you put meth last?

5       A.   Because that's what I suspected.  If he had any

6  illegal drugs in the vehicle, that's what it would be.

7       Q.   At that time you were suspicious that there

8  might be meth?

9       A.   Yes, sir.

10      Q.   And that was based on what?

11      A.   Based on my training and experience.

12      Q.   What specific things had you noticed that

13  caused you to suspect meth and not something else?

14      A.   The level of nervousness.  But that, I mean,

15  would cover drugs all together.  The meth sores that are

16  on him and Ms. Adams.

17           Also, whenever I was checking for weapons,

18  I felt something in his pocket and he pulled it out and

19  I asked him what it was and it was a remote.  It was a

20  remote and several loose wires and things in his pocket.

21           And that's one of the things that's also

22  common with meth users.  People who are on meth like to

23  take apart electronics.

24      Q.   Okay.

25      A.   So I noticed a lot of wires and loose things in

1 his pockets and that also made me suspicious.

2     Q.   That was one of the factors?

3     A.   Yes, sir.

4     Q.   So when you asked methamphetamine last in that

5 series of questions, what kind of response did you get?

6     A.   Well, when I asked the other questions first,

7 you know, he was responding to me pretty, you know,

8 normally.

9           And when I asked meth last, he kind of

10 dropped his head and thought about it and I could see a

11 change in his demeanor and then answered no.  But it

12 took a little while for him to answer that.

13     Q.   So he said no to each of those questions?

14     A.   Correct.

15     Q.   But when you asked meth, his demeanor changed?

16     A.   Yes, sir.

17     Q.   Is that a suspicious indicator to you?

18     A.   Yes, sir.  It is.

19     Q.   Is that why you asked it last?

20     A.   Yes, sir.

21     Q.   To see how he would respond?

22     A.   Yes, sir.  It is.

23     Q.   Trooper Frazier, can you tell us what the

24 counter is on the video there?

25     A.   15 minutes, 3 seconds.

1    Q.   Okay.  And about 15 minutes in you asked him if
2  you could have permission to search the car; is that
3  right?
4    A.   Correct.
5    Q.   And did he give you permission to search?
6    A.   No, he did not.
7    Q.   About this time, 15 minutes in, is when you
8  said he would not allow you to search?
9    A.   Correct.
10    Q.   I think we just heard that right after I paused
11  it at 15 minutes.
12         You informed him that you would be trying
13  to get a canine out there to do a free air search; is
14  that right?
15    A.   Yes, sir.
16    Q.   You were informing Mr. Pierce of that?
17    A.   Yes, sir.
18    Q.   That's not when you actually called for the
19  canine; that's when you told Mr. Pierce you were going
20  to do that?
21    A.   Correct, sir.
22    Q.   Okay.  Trooper Frazier, you're now talking to
23  Ms. Adams, who's in the front passenger seat of the car?
24    A.   Correct.
25    Q.   Did she tell you where they had been coming

1    from and where they were going?

2         A.   Yes, sir.

3         Q.   Where did she state that they were coming from?

4         A.   That they were in Wills Point to see his

5    family.

6         Q.   Is that different than what Mr. Pierce told

7    you?

8         A.   Yes, sir.  It is.

9         Q.   How is it different?

10        A.   She stated that they were seeing his family and

11   she stated that -- she stated that they were seeing his

12   family, she stated -- he stated that they were seeing

13   her family.  I think I got that right.

14        Q.   So each indicated they were there to see each

15   other's family?

16        A.   Yes, sir.

17        Q.   And obviously when Mr. Pierce told you where

18   they were going and coming from, Ms. Adams wasn't within

19   earshot at that time?

20        A.   Correct.

21        Q.   He was inside your car?

22        A.   Yes, sir.

23        Q.   And at this time when you're having a

24   conversation with Ms. Adams, Mr. Pierce is still in your

25   car?

1    A.   Correct.

2    Q.   So he can't overhear what she says?

3    A.   Yes, sir.

4    Q.   All right.  Did their stories of where they

5  were coming from, did those conflict?

6    A.   Yes, sir.  They did.

7    Q.   Trooper, you opened up the back.  What are you

8  doing?

9    A.   I'm getting his jacket out for him.

10   Q.   Why did you do that?

11   A.   Because it's cold outside and he's going to

12  stand outside the vehicle.

13   Q.   So you were going to get him outside of your

14  car?

15   A.   Yes, sir.

16   Q.   And it was cold out there?  It was cold that

17  night?

18   A.   Yes, sir.

19   Q.   I think you let Ms. Adams get her jacket?

20   A.   Yes, sir.

21   Q.   And did you already discuss with Mr. Pierce

22  about getting a jacket and to wait outside?

23   A.   Yes, sir.  I have.

24   Q.   Okay.  Are you checking the jacket now for

25  weapons?

1      A.    Yes, sir.

2      Q.    Why are you doing that?

3      A.    For officer safety.

4      Q.    And why did you feel you needed to check --

5  there was an officer safety issue?  What was the issue

6  there?

7      A.    The potential for guns or knives.

8      Q.    Okay.  Where were you going to have Mr. Pierce

9  wait?

10      A.    The ditch, basically, where Ms. Adams is but

11  further up by my car.

12      Q.    Okay.  Trooper Frazier, what's the counter on

13  the video now?

14      A.    24:36.

15      Q.    And this is the point where you're calling for

16  a canine to come out?

17      A.    Yes, sir.

18      Q.    And that's at 24 minutes, 36 seconds in to the

19  video?

20      A.    Yes, sir.  Correct.

21      Q.    Trooper Frazier, who were you talking to over

22  the radio?

23      A.    Over the radio I was talking to

24  Trooper Kris Baker.

25      Q.    And was there a -- does DPS have a drug dog?

1    A.   Yes, sir.  We do.

2    Q.   And was your -- the DPS drug dog available that

3  night?

4    A.   No, sir.  He was in Waco in training.  And

5  that's what I was talking to the sergeant about was the

6  fact that he wasn't available right then.

7    Q.   Trying to see if you could find another agency

8  dog?

9    A.   Yes, sir.  That's correct.

10    Q.   Trooper, can you tell us what the counter reads

11  on the video?

12    A.   30 minutes, 27 seconds.

13    Q.   And you just said the dog was on its way?

14    A.   Correct, sir.

15    Q.   That's when you found out somebody was coming

16  with a dog?

17    A.   Yes, sir.

18    Q.   Trooper Frazier, there's another trooper in the

19  video now; is that right?

20    A.   Yes.

21    Q.   Who is that?

22    A.   Trooper Baker.  Kris Baker.

23    Q.   And he's not the canine officer?

24    A.   No, he is not.

25    Q.   He just showed up to assist?

1      A.   Correct.

2      Q.   Trooper Frazier, we can see you and

3  Trooper Baker on the video now.  What's Trooper Baker

4  doing?

5      A.   He explained to Mr. Pierce that just not long

6  before that, we had had somebody in the same situation,

7  who was waiting on a canine, they jumped in their car

8  and drove off.  The vehicle was still running.

9           So we explained to them -- which I didn't

10 realize, but the driver's side window was down.  The

11 canine officers always want them up.

12          So he rolled up that window and we

13 explained to him about we were going to take the keys

14 out of the vehicle so he couldn't jump in it and drive

15 off.

16     Q.   So at this point, it's about 41 minutes in to

17 the vehicle, the car that you pulled over has been

18 running the whole time?

19     A.   Correct.

20     Q.   Key's in the ignition, even though nobody's in

21 the car?

22     A.   Correct.

23     Q.   So Trooper Baker was taking the keys out of the

24 ignition?

25     A.   Correct.

1    Q.   Just to be clear, Trooper Baker took the keys

2    out of the ignition and then closed the door back; is

3    that right?

4    A.   Correct.

5    Q.   Didn't remove anything else from the vehicle?

6    A.   No, he did not.

7    Q.   Okay.  Trooper, a couple of times in the video

8    now we talked about who owns the car; is that right?

9    A.   Correct.

10   Q.   Did Mr. Pierce or Ms. Adams, were they the

11   owner of the vehicle?

12   A.   Sir?

13   Q.   Who was the owner of the vehicle?

14   A.   Ms. Adams stated that her cousin's mother, I

15   believe, owned the vehicle.

16   Q.   Not Mr. Pierce?

17   A.   Correct.

18   Q.   Not Ms. Adams?

19   A.   Correct.

20   Q.   Was it registered -- a car registered in the

21   State of Texas?

22   A.   No, sir.  It was not.

23   Q.   Was it registered in Louisiana?

24   A.   No, sir.  It was not.

25   Q.   Where was it registered?

1      A.   It was registered out of Arkansas.

2      Q.   The fact that they were in Texas headed to

3 Louisiana with a car registered in a different state, is

4 that significant to you?

5      A.   Yes, sir.  It is.

6      Q.   Why is that?

7      A.   A lot of times whenever somebody is carrying

8 illegal drugs, they'll have a vehicle that's registered

9 from another state and they -- they have a link to it,

10 but they don't have a link to it, I guess you could say.

11 It's a third-party vehicle.  So it raised my suspicion.

12     Q.   It's not belonging to them?

13     A.   Correct.

14     Q.   It's belonging to some third party?

15     A.   Yes, sir.  Correct.

16          THE COURT:  Mr. Putman, would you stop the

17 video for a minute, please.

18          MR. PUTMAN:  (Complies.)

19          THE COURT:  I'm going to go ahead and take

20 up Mr. Gregory's case since it's 11:30.  We'll come

21 right back to this.

22          (Recessed.)

23          THE COURT:  Mr. Ellis, are you ready to

24 proceed?

25          MR. ELLIS:  Yes, Your Honor.

          THE COURT:  All right.  You may proceed,
Mr. Putman.

          (State's Exhibit 1S published.)

     Q.   (BY MR. PUTMAN)  Trooper, I heard you say,
"There he is right there."  What did you mean?

     A.   The canine officer.

     Q.   And could you tell us the time on the counter
there?

     A.   It's 52 minutes and 32 seconds.

     Q.   And that's when the canine officer arrived?

     A.   He was passing by on the westbound side.
Yes, sir.

     Q.   Trooper, what's the counter on the video now?

     A.   57 minutes and 39 seconds.

     Q.   Okay.  And can we see the dog going around the
vehicle at this point?

     A.   Yes, sir.

     Q.   Okay.  So the dog's searching at this time?

     A.   Yes, sir.

     Q.   And what's the counter on the video now?

     A.   58 minutes and 17 seconds.

     Q.   And does it appear that the dog search as been
completed now?

     A.   Yes, sir.

     Q.   Were you informed by the dog handler as to

1  whether or not the dog alerted or not?

2      A.   Yes, sir.  I was.

3      Q.   And were you informed that the dog did alert or

4  did not alert?

5      A.   That he did alert.

6      Q.   All right.  Trooper, what's the counter now?

7      A.   Counter is 59 minutes and 49 seconds.

8      Q.   And what are you and Trooper Baker about to

9  start doing?

10     A.   Conducting a vehicle search.

11     Q.   And did y'all search the vehicle at this time?

12     A.   Yes, sir.  We did.

13     Q.   And did you find anything when y'all searched

14 the vehicle?

15     A.   Yes, sir.  We did.

16     Q.   What did y'all find?

17     A.   We found a large gallon-sized clear bag with --

18 I'm trying to find the amount on it.  But approximately

19 a pound and a half of methamphetamine.

20     Q.   Where in the vehicle did you find it?

21     A.   It was in the back passenger -- backseat on the

22 passenger's -- driver's side.

23     Q.   In the passenger compartment of the vehicle?

24     A.   Yes, sir.

25     Q.   And the backseat?

1     A.   Yes, sir.

2     Q.   Which side:  the driver's side or the

3 passenger's side?

4     A.   The driver's side.  Behind the driver's seat in

5 a black backpack.

6     Q.   Inside of a black backpack?

7     A.   Yes, sir.  That's correct.

8     Q.   Did you place anyone under arrest for that

9 methamphetamine?

10     A.   Yes, sir.  We did.

11     Q.   Who did you place under arrest for that?

12     A.   Mr. Pierce and Ms. Adams.

13          MR. PUTMAN:  We pass the witness.

14          THE COURT:  Mr. Ellis?

15          MR. ELLIS:  Thank you, Your Honor.

16          Your Honor, just a housekeeping matter.

17 I'm just wondering what time we plan to stop?

18          THE COURT:  Probably around 12:30, maybe a

19 little later.

20          MR. ELLIS:  In that case, could I have a

21 brief recess to make a phone call, Your Honor?  I have a

22 meeting I don't want to miss.

23          THE COURT:  Sure.  5 minutes.

24          MR. ELLIS:  Thank you, Judge.

25          THE COURT:  Trooper Frazier, we're going to

1  be in recess for 4 and a half minutes now.

2              If you want to step down, you may.  Don't

3  discuss your testimony with anyone as you're currently

4  on the witness stand.

5              THE DEFENDANT:  Yes, ma'am.

6              THE COURT:  Thank you.

7              (Recessed.)

8              THE COURT:  All right.  Back on the record

9  in cause number 114-0648-13.  State of Texas versus

10  Joseph Pierce.  Counsel for the State, for the defendant

11  and the defendant are present.  You may be seated.

12              Mr. Ellis, your witness.

13              MR. ELLIS:  Thank you, Your Honor.

14                     CROSS-EXAMINATION

15  BY MR. ELLIS:

16      Q.   Trooper, hello.

17              Trooper, when -- when did you prepared this

18  report?

19      A.   2/27/13.

20      Q.   And you've had to rely on your report

21  substantially in preparing for this testimony, right?

22      A.   Say that again, please, sir?

23      Q.   In preparation for today's hearing you had to

24  review your report, right?

25      A.   Yes, sir.

1    Q.    That's normal for you?

2    A.    Yes, sir.  It is.

3    Q.    And you made your report.  Was that 5 days

4    after the incident?

5    A.    Yes, sir.

6    Q.    Do you recall how many days you worked in

7    between the date of offense and the date you made your

8    report?

9    A.    No, sir.  I don't.

10    Q.    But it's safe to say you probably did work a

11    few days in between?

12    A.    Yes, sir.

13    Q.    And every time you work a shift, you have

14    contact with dozens -- how many people do you contact?

15    A.    As far as contact or as far as traffic stops?

16    Q.    Well, both.

17    A.    Yeah, we have dozens.  That's safe to say.

18    Q.    And when you're making traffic stops, a lot of

19    those are what we call pretextual stops, right?

20    A.    Yes, sir.

21    Q.    Meaning that you're stopping people for minor

22    violations so that you can have an excuse to have

23    contact with them, right?

24    A.    I guess you could say that.  Yes, sir.

25    Q.    Well, at that point, you determine whether or

1    not you think they've been drinking or committing some

2    other crime, right?

3         A.   Yes, sir.

4         Q.   But for you to meet them, you've got to stop

5    them for something, right?

6         A.   Yes, sir.

7         Q.   And so you stop them for things that normally

8    you probably would not issue a citation for, right?

9         A.   I'm not sure exactly where you're going.

10        Q.   Well, yes or no.  Do you?  Do you stop people

11   for not having a license plate light?

12        A.   Yes, sir.

13        Q.   Do you normally issue a citation for that?

14        A.   No, sir.  I do not.

15        Q.   Do you stop people for not having a front

16   license plate mounted?

17        A.   Yes, sir.  I do.

18        Q.   Do you normally issue a citation?

19        A.   Not usually.

20        Q.   Do you recall in this case whether or not

21   Mr. Pierce had a license plate on the front of his

22   vehicle?

23        A.   I don't recall because it wasn't Texas

24   registration.

25        Q.   Are you familiar with Arkansas vehicles?

1    A.    No, sir.  I'm not.

2    Q.    Do you stop Arkansas vehicles very often?

3    A.    Yes, sir.

4    Q.    And you can't remember whether or not they keep

5    front license plates?

6    A.    I'm not sure of the laws of Arkansas -- the

7    state laws of Arkansas, sir.

8    Q.    But if you saw a vehicle without a license

9    plate, that would be a reason to stop it, wouldn't it?

10    A.    From Texas.  Yes, sir.

11    Q.    Sure.  Well, you wouldn't know, though, right?

12   If you saw a vehicle drive by and it didn't have a front

13   license plate and you pulled out and followed it, you

14   wouldn't know until you got pretty close what kind of

15   license plate it had, right?

16    A.    It just depends on the situation.  If they

17   drove right by me and I could see that it was a Texas

18   plate, then, yes, I would know that.

19           If there was -- the weather conditions, the

20   road conditions, you know, other traffic in the way,

21   maybe I would have to follow behind it to be able to

22   see.

23           So it just depends.  I can't say that for

24   sure, but --

25    Q.    Okay.

1    A.   -- it just depends on the situation.

2    Q.   So when you wrote this report, were you relying

3  mainly on memory or did you view the video prior to

4  writing this report?

5    A.   I reviewed the video.

6    Q.   Okay.  And how does that help you?

7    A.   Helps me to remember the things that happened

8  and the situation.

9    Q.   It's a lot to remember?

10   A.   Yes, sir.  It is.

11   Q.   In this case, where were you parked?

12   A.   On the scale house on the eastbound side of the

13 interstate.

14   Q.   Do you know about what mile marker that is?

15   A.   Approximately 544.

16   Q.   Okay.  And do you recall which mile marker you

17 stopped the defendant at?

18   A.   It was just west of 110.  So that would be

19 the -- no, I take that back.  It wasn't -- correction, I

20 wasn't parked at 544.  I was parked at 546.  That's

21 where the scale house is.

22   Q.   And you stopped the defendant at which mile

23 marker?

24   A.   547 A.  Something like that.

25   Q.   Did you make note of that in your report?

A.    I'll have to check to see.

Q.    Okay.  Go ahead and do that.

A.    Okay.  It says here on line 7 -- I note, "The
vehicle stopped on the improved shoulder of I 20, mile
marker 548.

Q.    What does driving on the improved shoulder mean
to you?

A.    It means that they -- the tire of the vehicle
touched the white line.

Q.    Who taught you that?

A.    I learned that at the DPS academy for training.

Q.    So it's been your training that if a tire
touches the white, that is driving on the improved
shoulder?

A.    Well, it's riding on the line.  Yes, sir.

Q.    Is riding on the line the same thing as driving
on the improved shoulder?

A.    Yes, sir.  It is.

Q.    So is it your -- are you telling the Court
today that you believe the fog line is part of the
improved shoulder?

A.    Yes, sir.

Q.    And were you trained that way by an attorney or
by a senior officer or trooper?

A.    Whoever taught our traffic class.  I don't

1  recall who it was.

2      Q.   And so you're saying it's regular practice with

3  DPS to pull people over for driving on the white line?

4      A.   I'm not going to say it's regular practice.

5  But I had noticed it two different times.  One time he

6  did cross completely over the white line and the second

7  time he was riding on top of the white line.

8      Q.   Okay.  So there were two times.  What was the

9  first time?

10     A.   He was driving over the white line.

11     Q.   And that's not on video?

12     A.   Correct.  Yes, sir.

13     Q.   Because that would have happened before the

14  vehicle crossed?

15     A.   Correct.

16     Q.   And so the video couldn't record that?

17     A.   Correct.

18     Q.   But you were able to see that?

19     A.   Yes, sir.  I was.

20     Q.   Do you recall what you told Mr. Pierce and

21  Ms. Adams, for that matter, when you approached the

22  vehicle and told them why you pulled them over?

23     A.   Told them because they hit the white line and I

24  stopped them to make sure they hadn't been drinking and

25  everything was okay.

1    Q.   But you didn't tell them you pulled them over

2 for crossing the white line; you told them you pulled

3 them over for hitting the white line, right?

4    A.   I don't recall exactly what I said.

5    Q.   Well, we can queue that up.  We'll -- we'll

6 come -- we'll queue that up here in a minute.

7             Tell me, Trooper, did you have any reason

8 to mislead Mr. Pierce when you told him why you pulled

9 him over?

10    A.   No, sir.

11    Q.   Sometimes officers have to be misleading to

12 suspects, right?

13    A.   I'm not sure exactly what you mean, sir.

14    Q.   Well, the point is, sometimes officers are

15 allowed to mislead a suspect while they're conducting an

16 investigation, aren't they?

17    A.   I don't know.

18    Q.   Do you not do that, then?

19    A.   No, sir.

20    Q.   Okay.  So you were honest with Mr. Pierce at

21 all times?

22    A.   Yes, sir.

23    Q.   All right.  And you told him the reason you

24 pulled him over, right?

25    A.   Yes, sir.

1    Q.   If you'll look at your police report for me,

2   does you report indicate what you did immediately after

3   you observed Mr. Pierce pass on the improved shoulder?

4   What's the next thing you did?

5    A.   I activated my emergency lights, camera,

6   microphone and initiated a traffic stop.

7    Q.   And, Trooper, so we're clear here, we're not

8   going to see him cross in front of you on this side of

9   the white line, are we?

10    A.   Correct.

11    Q.   What minute mark are we at, Trooper?

12    A.   Sir?

13    Q.   What minute mark are we at?  Is that 1?

14    A.   1 minute, 10 seconds.

15    Q.   You testified earlier that when you saw him

16   cross the white line you were concerned.  What did

17   that -- what could that possibly indicate to you?

18    A.   That somebody's driving while intoxicated,

19   using their cell phone.  It could be several different

20   things.

21    Q.   And that gives you concern, right?

22    A.   Yes, sir.

23    Q.   What do you think as a Trooper when you see

24   that happen?  What do you want to do next?

25    A.   Observe the vehicle and see if it commits any

1  other traffic violations, observe the driving.  It could

2  be somebody's on their cell phone, it could be that

3  they're intoxicated.

4      Q.   We're about 2 minutes, 15 seconds or so; is

5  that right?

6      A.   2:12.

7      Q.   Okay.  So at this point, you've pulled out,

8  right?

9      A.   Yes, sir.

10     Q.   But you haven't activated your overhead lights

11  yet, have you?

12     A.   No, sir.

13     Q.   We can tell that because we would see flashes

14  on the screen, wouldn't we?

15     A.   That's correct.

16     Q.   Okay.  You're driving pretty fast here?

17     A.   Yes, sir.

18     Q.   You clearly are going after Mr. Pierce's car?

19     A.   Yes, sir.

20     Q.   You're speeding up to get to that vehicle?

21     A.   Correct.

22     Q.   All right.  Well, let me know when we see it in

23  the screen.

24          Is that the vehicle there on the right?

25     A.   I believe so.

1    Q.   And you still have not yet activated your

2  lights?

3    A.   No, sir.

4    Q.   Okay.  At this point -- now, you testified

5  earlier that at this point he doesn't cross the fog line

6  or the white line, but he touches it a few times?

7    A.   He drives on top of it.  Yes, sir.

8    Q.   Drives on top of it.

9         Okay.  Tell me when you see him driving on

10 top of it.

11   A.   Looks like -- there it is.  There.

12   Q.   So there you think he touched it, right?

13   A.   Yes, sir.

14   Q.   You don't have the best perspective from here,

15 though, do you?

16   A.   No, I don't.

17   Q.   So from here, we can't tell for certain if

18 there's a few inches between his tire and the white line

19 or he's on top of it?

20   A.   Correct.

21   Q.   But to you, it looked like he touched it?

22   A.   Yes, sir.

23   Q.   But not that he crossed it.

24        Have you turned on your overhead lights

25 yet?

1     A.   No, sir.

2     Q.   But the reason we have the camera is because it

3 goes back 180 seconds or something like that?

4     A.   Whatever it's programmed for.  I'm not sure

5 exactly what the time is.

6     Q.   Okay.  Tell me when you turn on your overhead

7 lights.

8     A.   Now.

9     Q.   Okay.  So then shortly after what you observed

10 to be him touching the white line, which you testified

11 earlier was driving on the improved shoulder, you

12 activated your emergency lights, correct?

13     A.   Correct.

14     Q.   If we go back to your report again, what did

15 you tell me earlier was the first thing you did after

16 you saw him drive on the improved shoulder?

17     A.   Activated my lights.

18     Q.   So let's let that play again.  And if we could

19 pause it.

20           You haven't actually put the lights on yet,

21 right?

22     A.   I just did.

23     Q.   I think we're hearing the audio because it

24 kicks on earlier.

25     A.   Correct.  Correct.  And that's my mistake.

1 Correct.

2     Q.   Also you said (inaudible.)  Who's that?

3     A.   That wasn't me that was talking.  Just somebody

4 else that just came over the radio.

5     Q.   Okay.  And now we see the lights are on,

6 correct?

7     A.   Correct.

8     Q.   So to recap, you were sitting parked, he drove

9 by you, you pulled out, you sped up for him, you

10 followed him for a while -- for probably at least a

11 quarter mile or so?

12     A.   Yes, sir.  And the reason for that and why I'm

13 in the left lane is before I stop anybody I'll --

14            MR. ELLIS:  Object to nonresponsive,

15 Your Honor.

16            THE COURT:  Sustained.

17     Q.   (BY MR. ELLIS)  You follow him for a while,

18 correct?

19     A.   Correct.

20     Q.   You see him touch the white line, arguably a

21 few times, correct?

22     A.   Arguably to you, but I did.

23     Q.   Well, you believe -- you belive he touched the

24 white line a few times?

25     A.   Yes, sir.

1    Q.   That's what I'm asking.  And then you activate
2  your lights and pull him over, correct?
3    A.   Correct.
4    Q.   Now, at this point you're about to initiate a
5  traffic stop, right?
6    A.   Correct.
7    Q.   And it's your job to effect that traffic stop
8  as quickly as possible, right?
9    A.   In a timely manner for the situation.  I
10  wouldn't say as quickly as possible.  I mean, if I just
11  walked up to somebody and just went as quick as I could,
12  I would miss a lot of things and --
13    Q.   How long does it take you to police somebody
14  driving on the improved shoulder, if that's the only
15  thing you're handling?
16    A.   Several minutes.  A few minutes.
17    Q.   And you're not going to keep them any longer
18  unless you come to believe there's reasonable suspicion
19  of criminal activity, right?
20    A.   Correct.
21    Q.   I want you to listen closely to what you tell
22  him because I'm going to ask you about it.
23    A.   Okay.
24    Q.   So you told Mr. Pierce you pulled him over
25  because he touched the white line a few times, correct?

          A.    Correct.

          Q.    And specifically right when you got behind him
there?

          A.    Yes, sir.

          Q.    So not earlier, but right when you were behind
him driving behind him?

          A.    Yes, sir.

          Q.    In fact, you suspected it was because he might
have been distracted looking back your way.

          A.    Well, I asked him.  I said, "I didn't know if
you were just looking back at me or if you had been
drinking or on the phone."  Things like that.

          Q.    Okay.  This stretch of road, by the way, do you
patrol it frequently?

          A.    Yes, sir.

          Q.    In the spot where you were parked, do you
patrol that frequently?

          A.    Parked now or when I was on the side of the
road?

          Q.    Earlier.

          A.    Yes, sir.  I stayed at the scale house a lot.
Yes, sir.

          Q.    You're kind of concealed and you're safe
because you're off the road?

          A.    Yes, sir.

1     Q.   So, Trooper, are you telling the Court the

2  reason you pulled him over then was because he touched

3  the white line right there?

4     A.   And for driving over the top -- driving over

5  the white line before he got to my vehicle.  Yes, sir.

6     Q.   Now, you prepared this report afterwards,

7  relying on the video, right?

8     A.   Correct.

9     Q.   And in your report, do you note anywhere there

10  that he drove over the white line?

11     A.   No, sir.  I just put on there that he drove on

12  the improved shoulder.  That was the reason for the

13  stop.

14     Q.   And in your opinion, that would also include

15  driving on top of the white line?

16     A.   Yes, sir.

17     Q.   Trooper, 23 minutes and 45 seconds.  Where are

18  we at?  Did we pass it already?

19     A.   Yes, sir.  We're at 30:41.

20     Q.   We're going pretty fast, then.  Are we going

21  backwards now?

22     A.   Yes, sir.

23     Q.   There it is.

24            Okay.  Trooper, do you recognize this video

25  at this point?

1     A.   Yes, sir.

2     Q.   Where are we at in the whole process here?  I

3  skipped ahead.

4     A.   Yeah, I'm kind of lost a little bit.  I'm not

5  sure exactly.

6     Q.   I'm going to fast forward.  I think the

7  computer's responding a little slow and I clicked a few

8  too many times.

9          Okay.  So, Trooper, at this point in the

10  video, have you already inventoried the vehicle?

11     A.   I'm not sure.

12     Q.   I realize we skipped ahead.  But at some point,

13  you inventoried the vehicle and you arrest Mr. Pierce.

14     A.   I believe Trooper Baker inventoried the

15  vehicle.

16     Q.   I see in this video, while we're here, the

17  camera's looking back into the car, right?

18     A.   Correct.

19     Q.   How are you able to accomplish that?

20     A.   You have to go through the monitor on the

21  screen and make the screen split.

22     Q.   So you have the choice to do that?

23     A.   Yes, sir.

24     Q.   Earlier you brought Mr. Pierce into the vehicle

25  to question him, right?

1          A.    Correct.

2          Q.    And I think you made it clear from your

3    testimony earlier that not long after you stopped the

4    vehicle, you suspected there might be other criminal

5    activity, right?

6          A.    Correct.

7          Q.    And pretty early on you were wondering whether

8    or not it was some sort of drug interdiction case,

9    right?

10         A.    Correct.

11         Q.    And when you brought Mr. Pierce to your

12    vehicle, part of that was to have the chance to

13    interview him some more and decide whether or not you

14    thought he was running drugs, right?

15         A.    Well, initially it was for -- to talk to him

16    about his driver's license because he told me that it

17    was suspended and ask him some questions about it.

18              I couldn't answer the questions about it.

19    I was going to have to look up some things in my

20    computer and it's cold and windy outside.  So that's the

21    reason why.

22         Q.    But the -- the interview served multiple

23    purposes, though, right?

24         A.    Yes, sir.

25         Q.    As a trooper, you're often times doing that?

1      A.   Yes, sir.

2      Q.   You're gathering information, but you're also

3 investigating at the same time?

4      A.   Yes.

5      Q.   And when you were asking him questions, I

6 believe you testified earlier that his demeanor changed,

7 correct?

8      A.   Yes, sir.  At one point it did.  I'm not sure

9 exactly when you're talking about.  But yes, sir.

10     Q.   When you had him in the car you asked him if he

11 had anything illegal in the vehicle?

12     A.   Yes, sir.

13     Q.   And then you asked him specifically about other

14 illegal -- he said no to that, right?

15     A.   Correct.

16     Q.   And then you asked him specifically about cash,

17 about guns and different drugs, right?

18     A.   Correct.

19     Q.   Those questions were repetitive, weren't they?

20     A.   Yes, sir.

21     Q.   I mean, if someone said they don't have

22 anything illegal in the car and they're telling the

23 truth, then they don't have any drugs or guns, right?

24     A.   Correct.

25     Q.   So it could be a bit frustrating being asked

1  the same question over and over again, right?

2      A.   Well, it's not the exact same questions.  I was

3  just asking specific things.

4      Q.   And the questions you asked him -- you asked

5  him a series of questions.

6      A.   Yes.

7      Q.   And according to your testimony, he didn't

8  change his demeanor until the final question.

9      A.   Correct.

10     Q.   You said you asked that question last, by the

11 way, about meth.

12          Have you received specific training that

13 asking that last question will indicate drug behavior or

14 is that something you've come to do on your own?

15     A.   I've been to some training where that's

16 happened in the past and, you know -- so, yes.  The

17 training, yes.

18     Q.   Well, I want to find that spot in the video

19 where --

20          I'm going to fast forward until we see that

21 y'all are opening the trunk up.  That's what I want to

22 get to.  While that's fast forwarding, I'm going to keep

23 an eye on it and ask you a few questions.

24     A.   Yes, sir.

25     Q.   Try to speed things along.

1            Trooper, what does reasonable suspicion

2   mean to you?

3       A.   What a reasonable person or reasonable police

4   officer would -- would suspect is going on.

5       Q.   And what do you have to find to determine

6   there's reasonable suspicion?

7       A.   They -- I can't say one thing in particular.

8   It just depends on the situation.

9       Q.   Okay.  In this case, you stop Mr. Pierce for a

10  traffic violation, right?

11      A.   Correct.

12      Q.   And you have to write him a ticket and let him

13  go unless you determine there's something else to

14  investigate, right?  You know you can't keep him there

15  all day on the side of the road for a ticket, right?

16      A.   Correct.  Yes, sir.

17      Q.   Pretty early on in your detention, you

18  determined that he -- you thought you needed to

19  investigate further, right?

20      A.   Correct.

21      Q.   And then you brought him back to the vehicle?

22      A.   Correct.

23      Q.   Then you asked him a number of questions and

24  then you determined that you wanted to get consent to

25  search the vehicle, right?

A.   Correct.

Q.   And they didn't give you consent?

A.   No, sir.

Q.   You went back and forth with them a few times trying to get consent, but you didn't get consent?

A.   No, I wasn't trying to get consent.

Q.   So you tried to get it once and then he refused?

A.   He asked me some questions about it as far as the ticket goes and that's what we were discussing on there.

Q.   And at that point, I believe you tell him--tell me if I'm right--"That's within your rights to refuse, but I'm also within my rights to call a canine unit"?

A.   Correct.  Something like that.  Yes, sir.

Q.   And earlier, I put that down at 15 minutes and 3 seconds.  Does that sound about right?

A.   I have no idea.  But okay.

Q.   It was about that long in to the stop, wasn't it?

A.   Okay.

Q.   After that point, though, you don't call a canine unit, do you?  Not right away?

A.   Not immediately.  No, sir.

Q.   You get out of the vehicle and you go to the

1    passenger's side of the vehicle where you talked with

2    the young woman in the vehicle, right?

3        A.   Correct.

4        Q.   You talk with her for a while and you try to

5    obtain consent from her to search the vehicle?

6        A.   No, sir.

7        Q.   Well, didn't you ask her who owned the vehicle?

8        A.   I was asking her who owned the vehicle.

9    Yes, sir.

10       Q.   Okay.  You spent some time talking with her

11   before you got her out of the vehicle, right?

12       A.   Correct.

13       Q.   And finally, at 24 minutes and 30 seconds, you

14   request a canine to come, right?

15       A.   Correct.

16       Q.   So you agree that you let 9 minutes elapse

17   after determining you wanted a canine and consent to

18   search had been refused?  You waited 9 minutes before

19   you called for a canine, right?

20       A.   If that's what the time is.  Yes, sir.

21       Q.   If you're not satisfied with that, we can go

22   back.  But --

23       A.   No, I'm satisfied with --

24       Q.   And then from the time you requested a canine

25   at 24 minutes and 30 seconds, the canine didn't arrive

1  and actually start performing a search until 57 minutes

2  and 39 seconds.

3          All right.  I know it gets loud, but what I

4  want you to focus on at this place, Trooper, is you're

5  having a conversation with Trooper Baker.  I believe

6  that's you two in the vehicle, right?

7      A.  Yes, sir.

8      Q.  Okay.  And I think you've searched the vehicle

9  at this point and you're putting stuff back in the

10 trunk; is that right?

11     A.  I guess.  I haven't watched the video long

12 enough to know exactly what we were doing at this point.

13     Q.  Trooper Baker's going to ask you later on why

14 you stopped him and I want you to listen to that so you

15 can testify.  Can you hear okay?

16     A.  No, sir.

17     Q.  It's tough to hear.  All right.  Well, I know

18 it's after Officer Hill leaves the scene so we'll see if

19 the audio improves.

20          So there, the canine officer is asking you

21 about your earlier interrogation, your interview, with

22 Mr. Pierce, right?

23     A.  Correct.

24     Q.  And he was asking you how his demeanor reacted,

25 right?

1     A.   Correct.

2     Q.   It appeared to me that you hadn't given that

3 much thought at that point what they were considering;

4 is that right?

5     A.   I'm not sure exactly what you mean.

6     Q.   Well, it seems to me in the video it wasn't up

7 until that point that you paid any particular notice to

8 Mr. Pierce dropping his head or saying anything of the

9 kind.

10    A.   No, I had.

11    Q.   You had?

12    A.   Yes, sir.  I mean, I hadn't talked about it to

13 a bunch of people because there's a million things going

14 on at that time.

15    Q.   And when he was in the car, you had the option

16 to turn on the camera so we could see Mr. Pierce when

17 you were having that conversation, right?

18    A.   Yes, sir.  And I just didn't think about it.

19    Q.   Okay.  I was going to try to speed up to the

20 spot so you could find it.

21    A.   Okay.

22    Q.   Trooper, it's difficult to watch this video

23 without time and date stamps.  But the one you recorded,

24 did it have a time and date stamp on it?

25    A.   I can't recall.

1          Q.    Trooper, I do think this is the spot I want you

2    to pay attention to --

3          A.    Okay.

4          Q.    -- concerning the conversation you were having

5    with Detective Baker.

6          A.    Okay.

7          Q.    Did you hear that?

8          A.    No, sir.  I didn't.

9          Q.    I only heard it because I've watched this thing

10   too many times.  And the audio --

11              MR. ELLIS:  I'm not familiar with the

12   equipment, Judge.

13         Q.    (BY MR. ELLIS)  But I want you to listen to it

14   carefully.  I believe, when you listen to it,

15   Trooper Baker asked you, "What did you pull him over

16   for?  What did you get him for?"  And you're going to

17   say something like, "Driving on the white line" or

18   "Driving on the shoulder."

19              And then you're even going to specify that

20   what you meant was the time when you were behind him and

21   you thought he was looking back at you.

22              So let's get back there.  I'll try to

23   rewind a few seconds and get back to that.

24              Did you hear?

25         A.    I heard some of it.

1    Q.    Did you hear him (sic) say, "You looking back

2  at me"?  Did you hear you saying that statement?

3    A.    Yes, sir.

4    Q.    Clearly you were referring to Mr. Pierce

5  potentially looking back at you --

6    A.    And that's the reason he was hitting the

7  shoulder.  Yes, sir.

8    Q.    So twice now in the video you've indicated the

9  reason you pulled Mr. Pierce over was for driving on the

10  white line, which you consider driving on the shoulder,

11  while you were immediately behind him, correct?

12    A.    Yes, sir.

13    Q.    And you also indicate in the report that the

14  first thing you do is you turn on your emergency lights

15  and camera system after he commits that violation,

16  right?

17    A.    I don't say immediately after he commits a

18  violation.

19    Q.    Okay.  But it's the next thing you do, right?

20         Does your report indicate that you saw him

21  commit the violation, had to enter traffic, follow him

22  to catch up to him and follow him for a quarter mile?

23    A.    No, sir.  It doesn't say that.

24    Q.    It just indicates that you saw him commit the

25  violation and you activated your overhead lights, right?

1    A.   Yes, sir.

2    Q.   And when we watch the video we saw him drive on

3    the white line, according to your testimony, and then

4    you activated your overhead lights, right?

5    A.   Yes, sir.

6              THE COURT:  Mr. Ellis, how much more do you

7    have of this witness?

8              MR. ELLIS:  Your Honor, I would say 10,

9    15 minutes.

10             THE COURT:  We're going to have to recess

11   the hearing.  We have a jury trial starting in about 25,

12   20 minutes.

13             MR. ELLIS:  Okay.

14             THE COURT:  All right.  We're going to

15   recess this hearing.  I apologize we didn't get this

16   finished this morning.  We're going to take this back up

17   on Thursday at 10 o'clock.

18             We'll let you know, Mr. Ellis, if for some

19   reason we're not finished with the trial we're about to

20   start now.  But I would anticipate that we would at

21   least be with the jury having the case at that time, if

22   not completely finished.

23             Also, Mr. Ellis, if you're more familiar

24   with your own equipment, please feel free to bring your

25   own equipment so that you're not struggling with the

1  State's equipment as far as finding places on the video.

2           MR. ELLIS:  Sure.

3           THE COURT:  Because I feel like we've spent

4  a lot of time looking for places on the video when

5  maybe --

6           MR. ELLIS:  It's not so much --

7           THE COURT:  Excuse me.  Just a minute.

8  I'll let you say something in just a minute.

9           But if you would be more familiar with your

10  own equipment, please feel free to do that, to bring it.

11  Because we're wasting a lot of time looking for places

12  on the video.

13           Okay.  Did you have something else you

14  wanted to add to that?

15           MR. ELLIS:  Well, I just wanted the Court

16  to know that I certainly have put down the time dates.

17  The difficulty is the software.

18           THE COURT:  Okay.  Well, if you could --

19  anything you can do to expedite that, that would be

20  great.

21           MR. ELLIS:  I will try, Your Honor.

22           THE COURT:  We're in recess on this matter

23  until 10 o'clock on Thursday.

24           THE WITNESS:  Thank you, Judge.

25           THE COURT:  Again, you're not to discuss

1  your testimony with the lawyers, the State, the defense,

2  their investigators, or anybody because you are still on

3  the witness stand.

4              THE WITNESS:  Yes, ma'am.  Thank you.

5              THE COURT:  See you Thursday.

6              (Proceedings adjourned.)

```
1                    REPORTER'S CERTIFICATE

2
   THE STATE OF TEXAS )
3  COUNTY OF SMITH    )

4

5      I, Cassie Condrey, Official Court Reporter in and

6  for the 114th District Court of Smith County, State of

7  Texas, do hereby certify that the above and foregoing

8  contains a true and correct transcription of all

9  portions of evidence and other proceedings requested in

10 writing by counsel for the parties to be included in

11 this volume of the Reporter's Record, in the

12 above-styled and -numbered cause, all of which occurred

13 in open court or in chambers and were reported by me.

14     I further certify that this Reporter's Record of

15 the proceedings truly and correctly reflects the

16 exhibits, if any, admitted by the respective parties.

17     WITNESS MY OFFICIAL HAND this the 24th day of June,

18 2014.

19
                     _/s/Cassie Condrey_____
20                   CASSIE CONDREY,  TX CSR #9035
                     Certification Expires: 12-31-14
21                   Official Court Reporter
                     114th Judicial District Court
22                   Room 212
                     Smith County Courthouse
23                   Tyler, TX 75702
                     (903) 975-4331
24

25
```