REPORTER'S RECORD

VOLUME 6 OF 12 VOLUMES

TRIAL COURT CAUSE NO. 114-0648-

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
6/24/2014 4:26:00 PM
CATHY S. LUSK
Clerk

| | |
|---|---|
| STATE OF TEXAS | ) IN THE DISTRICT COURT |
| | ) |
| | ) |
| | ) |
| VS. | ) SMITH COUNTY, TEXAS |
| | ) |
| | ) |
| | ) |
| JOSEPH M. PIERCE | ) 114TH JUDICIAL DISTRICT |
| | ) |
| | ) |

*********************************************************

HEARING ON MOTION TO SUPPRESS

*********************************************************

On the 24th day of October, 2013, the following proceedings came on to be heard in the above-styled and -numbered cause before the HONORABLE CHRISTI J. KENNEDY, Judge Presiding, held in Tyler, Smith County, Texas:

Proceedings reported by Computerized Machine Stenography, Reporter's Record produced by Computer-Assisted Transcription.

Court Reporter: CASSIE CONDREY.
                Texas CSR #9035
                Official Court Reporter
                114th Judicial District Court
                212 Smith County Courthouse
                Tyler, Texas 75702
                (903) 975-4331

1                    A P P E A R A N C E S

2

3   FOR THE STATE:
          Mr. Jacob Putman
4         SBOT NO.:  24065929
          Smith County District Attorney's Office
5         100 North Broadway Avenue
          Fourth Floor
6         Tyler, Texas  75702
          Telephone: (903) 590-1713
7

8   FOR THE STATE:
          Mr. Christopher Gatewood
9         SBOT NO.:  24062488
          Smith County District Attorney's Office
10        100 North Broadway Avenue
          Fourth Floor
11        Tyler, Texas  75702
          Telephone: (903) 590-1720
12

13  FOR THE DEFENDANT:
          Mr. Jason A. Ellis
14        SBOT NO.:  24052915
          Law Offices of Jason A. Ellis
15        120 South Broadway Avenue
          Suite 109
16        Tyler, Texas  75702
          Telephone:  (903) 705-6236
17

18

19

20

21

22

23

24

25

INDEX

Appearances                                              2

JEREMY FRAZIER

   Cross-Examination Continued by Mr. Ellis         6

   Redirect Examination by Mr. Putman              21

   Recross-Examination by Mr. Ellis               32

JOSH HILL

   Direct Examination by Mr. Putman               37

   Cross-Examination by Mr. Ellis                 49

Reporter's Certificate                                  70

P R O C E E D I N G S

1

2      THE COURT:  All right.  This is cause

3  number 114-0648-13.  State of Texas versus Joseph

4  Pierce.  Counsel for the State, counsel for the

5  defendant and the defendant are present in the

6  courtroom.

7      I think Mr. Frazier was on the stand.

8      MR. PUTMAN:  He was.  I haven't seen him

9  this morning.

10      THE COURT:  All right.

11      MR. PUTMAN:  I'll check the hall.

12      THE COURT:  You can come on, Mr. Pierce,

13  and have a seat there next to Mr. Ellis.

14      THE DEFENDANT:  Good morning, Your Honor.

15      THE COURT:  Good morning.

16      MR. PUTMAN:  Your Honor, I can't recall

17  what we said when we broke on Monday.  What time we

18  said.  Trooper Frazier's not here yet.  I assume he's on

19  his way.  I tried to call him.  It went to voice mail,

20  which it would do if he's driving, I guess.

21      But if the Court wants to wait, obviously,

22  we're happy to wait.  If we wanted to go out of order

23  and put on Officer Hill and then go back to

24  Trooper Frazier, we can get some --

25      THE COURT:  Well, there is Trooper Frazier

1  right there.

2              MR. PUTMAN:  There we go.

3              THE COURT:  Trooper Frazier, you're back on

4  the witness stand.

5              THE WITNESS:  Yes, ma'am.

6              THE COURT:  Trooper Frazier, you're not in

7  any kind of trouble, but what time did you think we were

8  coming back today?

9              THE WITNESS:  10 o'clock, ma'am.

10             THE COURT:  That's what I thought, too.

11 Everybody else thought it was 9:30.  But anyway, that's

12 why I say you're not in any trouble because I thought

13 10 o'clock, too.  But apparently it's 9:30.

14             THE WITNESS:  Yes, ma'am.

15             THE COURT:  Don't worry about it.  Have a

16 seat.

17             All right.  This is cause number

18 114-0648-13.  State of Texas versus Joseph Pierce.

19 Counsel for the State, counsel for the defendant and the

20 defendant are present.

21             Trooper Pierce -- excuse me,

22 Trooper Frazier was on the witness stand.  It was the

23 defense cross-examination of him.  You may proceed.

24             MR. ELLIS:  Your Honor, may I approach and

25 retrieve the exhibits?

1          THE COURT:  You may.  And would you turn on

2   your microphone, please?

3          MR. ELLIS:  Yes.

4              CROSS-EXAMINATION CONTINUED

5   BY MR. ELLIS:

6      Q.   Good morning.

7      A.   Good morning.

8      Q.   All right.  We'll try to go quick today.

9          Trooper, I just want to recap a few quick

10  things.  This offense took place on February 22nd, 2013?

11     A.   Correct, sir.

12     Q.   And according to your report, you prepared the

13  report 5 days later on the 27th; is that right?

14     A.   I believe so, sir.

15     Q.   Is that correct?

16     A.   Yes, sir.

17     Q.   Okay.  And when you prepared that report you

18  prepared it in large part relying on the video that was

19  recorded that day?

20     A.   Correct, sir.

21     Q.   And preparing for your testimony today, you

22  relied on your video and report?

23     A.   Correct, sir.

24     Q.   Okay.  And in preparing for your testimony

25  today and I guess last Monday as well, did you speak to

1  anyone beforehand?

2      A.   No, sir.

3      Q.   You didn't speak with the District Attorney's

4  Office at all?

5      A.   I'm sorry.  Today or --

6      Q.   Well, at any time before today's hearing, did

7  you speak with the District Attorney's Office before

8  testifying?

9      A.   Yes, sir.

10     Q.   About how you would testify?

11     A.   Just about the case in general.

12     Q.   Sure.  Did you talk about the nature of the

13 stop?

14     A.   Not that I recall.  No, sir.

15     Q.   You didn't talk about the reason why you

16 stopped Mr. Pierce's vehicle?

17     A.   We discussed the reason why I -- we stopped the

18 vehicle -- or I stopped the vehicle.

19     Q.   Did you explain to them at that time that the

20 reason you stopped the vehicle was driving on the

21 improved shoulder?

22     A.   Yes, sir.

23     Q.   And that the offense, in your mind, occurred

24 twice that evening?

25     A.   Yes, sir.

1     Q.    It occurred once off video and it occurred a
2  second time on video, correct?
3     A.    Yes, sir.
4     Q.    Okay.  And you testified earlier that when it
5  occurred on video he hit the white line but did not
6  cross it, correct?
7     A.    Say that again.
8     Q.    So the second occurrence, he hits the white
9  line?
10     A.    Yes, sir.
11     Q.    And the first occurrence, which we can't see in
12  the video, he crosses the white line?
13     A.    Yes, sir.
14     Q.    When you look at your report, you didn't detail
15  two specific incidents of him violating that traffic
16  violation, right?
17     A.    No, sir.
18     Q.    Wouldn't you normally indicate
19  separate episodes of bad driving in a police report?
20     A.    I normally don't.  No, sir.
21     Q.    You normally don't?
22     A.    No, sir.
23     Q.    And when you testified today about him crossing
24  over the white line, that would happen before he got to
25  the weighing station or right after?  Where would it

1  have happened at?

2      A.   After.

3      Q.   Right after?

4      A.   After he passed the weigh station -- are you

5  talking about the actual structure of the building?

6      Q.   Sure.

7      A.   Yes, sir.  After he passed the structure.

8      Q.   So we clarify, that weighing station, a truck

9  would pull off and there's a building there next to the

10 side of a pull-off road?

11     A.   It's a small shack.  But yes, sir.

12     Q.   Right.  And there's actually, like, a concrete

13 wall kind of separating the main road from that area

14 where the trucks pull off to?

15     A.   Correct, sir.

16     Q.   I guess for safety?

17     A.   Uh-huh.

18     Q.   And you're testifying he cleared that shack

19 when he crossed the white line?

20     A.   Yes, sir.  He was actually way past it because

21 that concrete barrier goes quite a ways past that shack.

22 And I was sitting far enough out -- I was actually on

23 the exit ramp is where I was sitting, so he was past

24 that concrete wall and structure.  Yes, sir.

25     Q.   Okay.  And you're testifying on memory at this

1 point, right?

2     A.   Yes, sir.

3     Q.   He crossed the white line.  Was that a brief

4 crossing?

5     A.   Couple of seconds.

6     Q.   Did he cross it with all four tires?

7     A.   No, sir.  The two right side tires.

8     Q.   Two right side tires.  Do you remember how much

9 he crossed it by?

10     A.   Half the car length.

11     Q.   Half the car length?

12     A.   Half the width of the car.

13     Q.   Would you agree that that is not the kind of

14 driving we see later on in the video?

15     A.   Yes, sir.

16     Q.   Okay.  And at the time he crosses your vehicle

17 in front of you, he's completely within his lane, right?

18     A.   Yes, sir.

19     Q.   So how far were you parked from the shack?

20     A.   Several hundred feet.  I can't say exactly.

21     Q.   Well, you were still parked in the lane that

22 would merge the weigh station back to the main

23 interstate, right?

24     A.   Correct, sir.

25     Q.   All right.  And he is past the shack at this

1  point, which is midway through the weigh station, right?

2      A.   Yes, sir.

3      Q.   And he is past that already.  Has he passed the

4  concrete wall yet?

5      A.   Yes, sir.

6      Q.   All right.  And that goes for the length of the

7  weigh station?

8      A.   No, sir.

9      Q.   It doesn't go for most of the weigh station?

10     A.   It goes for most of it, but it doesn't go for

11  the whole length of it.  No, sir.

12     Q.   Okay.  So he's past the concrete wall, so he's

13  most the way cleared the pull off for trucks to get

14  weighed, right?

15     A.   Yes, sir.

16     Q.   And at that point you're saying he was -- half

17  of his vehicle was on the side of the road?

18     A.   Yes, sir.

19     Q.   And this is from memory, right?

20     A.   Yes, sir.

21     Q.   How fast had he been going, approximately?

22     A.   He was probably going about the speed limit.

23  Probably about 70 miles per hour.

24     Q.   Pretty fast, right?

25     A.   Yes, sir.

1    Q.   Okay.  So it wouldn't take him very long at all

2 to get from the spot you saw him halfway off the road in

3 front of your vehicle, would it?

4    A.   I don't understand what you mean, sir.

5    Q.   So how long would it take Mr. Pierce's vehicle

6 to travel -- so there's the spot where he was halfway

7 off the road, according to your testimony, right?

8    A.   Uh-huh.

9    Q.   From that spot until he crossed in front of

10 your camera, how long would that take?  It would be very

11 quick, wouldn't it?

12    A.   Yes, sir.

13    Q.   Maybe a second or two?

14    A.   Yes, sir.

15    Q.   Right?

16    A.   Uh-huh.

17    Q.   Especially at that speed?

18    A.   Yes, sir.

19    Q.   So is it your testimony today that he was

20 halfway off the road and at 75 miles per hour he was

21 able to get completely back within his lane within a

22 second or two?

23    A.   Yes, sir.

24    Q.   It is?

25    A.   Yes, sir.

1    Q.   Okay.  You would also agree, though, that later

2  on when you spoke with Mr. Pierce, that is not the

3  reason you gave him for pulling him over, right?

4    A.   I just told him that he had hit the white line,

5  crossed over the white line.  And the reason for me

6  saying that is a lot of times when I tell somebody that

7  they're driving on the shoulder, they also don't

8  understand -- most people understand that driving on the

9  shoulder is when they're completely off the road and

10  they're driving down the shoulder.

11         So that's why I explain it like that

12  because it helps people to understand why.

13    Q.   Okay.  And then when you spoke to Trooper Baker

14  later on, you also told him it's because he had driven

15  on the shoulder when you were behind him, correct?

16    A.   I couldn't hear the video really well.  But I

17  do recall him saying something about -- asking

18  Mr. Pierce if he was looking back at me --

19    Q.   Right.

20    A.   - or if he was on his phone or the reasons why.

21    Q.   Okay.  Would you normally pull someone over for

22  just striking the white line?

23    A.   Just depends on the situation and the driving

24  behavior.

25    Q.   I want to talk about the detention.  We talked

1    a little bit about that last Monday.

2              When you pull someone over, you're going to

3    write a ticket unless you begin a new investigation

4    before that time is up, right?

5         A.   Or warning.  Yes, sir.

6         Q.   Okay.  Exactly.  In this case, in your mind,

7    you began a drug investigation for drug possession,

8    correct?

9         A.   Correct, sir.

10        Q.   And about 15 minutes in to the video, which is

11   about 12 minutes or 10 minutes after you stop

12   Mr. Pierce, you have him in your vehicle at some point

13   and you're talking to him about the reason he's on the

14   road, correct?

15        A.   Correct, sir.

16        Q.   And you asked for consent to search the

17   vehicle?

18        A.   Yes, sir.

19        Q.   And he tells you that he doesn't want to,

20   correct?

21        A.   Correct.

22        Q.   And you advised him that's his right.  But it's

23   also your right to get a drug dog out there?

24        A.   Yes, sir.

25        Q.   So at that point, in your mind, you had already

1   determined you had reasonable suspicion to have the

2   vehicle searched?

3        A.   Yes.

4        Q.   Or to have it investigated by a dog?

5        A.   Yes, sir.

6        Q.   And at that point, you had yet to speak with

7   Ms. Adams about where they were coming from, right?

8        A.   Yes, sir.

9        Q.   Earlier you testified that their stories

10  conflicted.  But at the point that you decide to detain

11  Mr. Pierce longer so that you could conduct a drug

12  investigation, you hadn't discovered any conflicting

13  stories yet, right?

14       A.   No, sir.

15       Q.   Okay.  And at some point along the way,

16  Mr. Pierce gets cold.  It's cold out there that night,

17  right?

18       A.   Yes, sir.

19       Q.   And one of the troopers--I don't recall if it

20  was you--goes to retrieve a jacket for him?

21       A.   Yes, sir.

22       Q.   And at that point you have to search the

23  jacket, right?

24       A.   After I took it out of the vehicle.  Yes, sir.

25       Q.   You're going to search it to make sure there's

1  no weapons in it?

2      A.  Correct, sir.

3      Q.  And when you do that, you find some of these

4  wires and remotes you were referring to earlier, right?

5      A.  Yes, sir.

6      Q.  And so that was also after the point that you

7  had detained Mr. Pierce so that you could have a drug

8  dog come out, right?

9      A.  I believe so.  Yes, sir.

10     Q.  You didn't log the wires, the remotes, into

11  evidence, did you?

12     A.  No, sir.  I did not.

13          MR. ELLIS:  Your Honor, I believe the State

14  and I are also able to stipulate at this point that the

15  wires and remotes are not in the personal property of

16  Mr. Pierce.

17          MR. PUTMAN:  We don't have any objection to

18  that proffer by Mr. Ellis, Your Honor.

19          THE COURT:  All right.

20     Q.  (BY MR. ELLIS)  So earlier when you decided to

21  detain Mr. Pierce longer to do an investigation, at that

22  point the evidence that you, I believe, testified to was

23  that he was nervous, right?

24     A.  Yes, sir.

25     Q.  But it's not abnormal for someone to be nervous

1  when you pull them over, is it?

2      A.   No, sir.  But to that level, yes, sir.

3      Q.   You also testified that he dropped his head

4  when you asked him about the drugs, right?

5      A.   Specifically about the methamphetamine.

6      Q.   Specifically about meth.  Right.

7      A.   Yes, sir.

8      Q.   And that was in the vehicle?

9      A.   Yes, sir.

10     Q.   And you could have recorded that so we could

11 have seen Mr. Pierce's reaction.  But you forgot to

12 record that, right?

13     A.   I forgot to switch the video over to --

14     Q.   It was still recording forward?

15     A.   Yes, sir.

16     Q.   You may need to refer to your report for this

17 one.  But mile marker 546, that is right where you're

18 parked before you pull -- before you pull out to go get

19 Mr. Pierce, right?

20     A.   Yes, sir.

21     Q.   It's right there at the end of the weigh

22 station, basically?

23     A.   Correct, sir.

24     Q.   And if you look at your report, you issued a

25 citation for driving on the improved shoulder for mile

1  marker 548, correct?

2      A.   I might have.

3      Q.   Do you have your report in front of you?

4      A.   No, sir.  I left it out in the car.  I forgot

5  it.

6      Q.   Well, I can approach you with a copy of your

7  report, if you don't mind.

8      A.   That would be fine, sir.

9      Q.   Unless you already remember that it was mile

10  marker 548 when you wrote the ticket.

11      A.   Okay.  I trust -- if that's what's in the

12  report, I trust that's what it is.

13          MR. ELLIS:  Your Honor, permission to

14  approach the witness?

15          THE COURT:  You may.

16      Q.   (BY MR. ELLIS)  Okay.  This looks like a copy

17  of the ticket you wrote.

18      A.   Yes, sir.

19      Q.   Okay.  Are you comfortable, after seeing that,

20  testifying that it was at mile marker 548 that you

21  issued a citation for driving on the improved shoulder?

22      A.   Yes, sir.

23      Q.   Okay.  Thank you.

24          Trooper, even though you determined while

25  you were in the vehicle with Mr. Pierce that you were

1  going to need to bring a dog out to search the vehicle,
2  you didn't do that right away, did you?
3      A.   Not immediately.  No, sir.
4      Q.   You got out of the vehicle, right?  And you
5  went to see Ms. Adams?
6      A.   Yes, sir.
7      Q.   You spoke with her for a little bit, took care
8  of some other business, and then you phoned in to get a
9  dog out there, right?
10     A.   Correct, sir.
11     Q.   I think you found out at that point that there
12 weren't a lot of dogs available, right?
13     A.   Well, DPS -- we have to first call for our
14 canine -- DPS canine first.  I wasn't aware that he was
15 in Waco for training, so I had to find another canine.
16     Q.   Now, did you try calling Precinct 5 Constable's
17 Office?  They use a drug dog, don't they?
18     A.   Yes, sir.  They do.
19     Q.   And they're right there on the interstate,
20 aren't they?  In Lindale?
21     A.   I'm not sure where he lives and they had
22 recently got a new canine and I don't -- at the time, I
23 didn't know the new canine handler or his phone number.
24     Q.   When Mr. Pierce would have driven by you, as he
25 passed you, would you have been able to see his license

1  plate when you were parked on the side of the road?

2       A.   I can't recall, sir.

3       Q.   I'm asking just normally would you --

4       A.   Normally.  Depends on how bright their license

5  plate light is.

6       Q.   Okay.

7       A.   It just depends.

8       Q.   So today you're testifying based on memory in

9  large part, aren't you?

10       A.   Yes, sir.

11       Q.   At least for the portion that occurs before we

12  can look at the video?

13       A.   Correct, sir.

14       Q.   And this happened some time ago?

15       A.   Yes, sir.

16       Q.   Do you remember everything you did that

17  evening?

18       A.   No, sir.

19       Q.   And you make a lot of stops like this, right?

20       A.   Like this?  I mean --

21       Q.   Well, you make a lot of traffic stops?

22       A.   Yes, sir.

23       Q.   And a lot of investigations?

24       A.   Yes, sir.

25       Q.   Do you do things the same way each time?

1    A.   I try to.

2    Q.   And that helps you remember later on what you

3 did?

4    A.   Yes, sir.

5         MR. ELLIS:  Pass the witness, Your Honor.

6         THE COURT:  Mr. Putman?

7              **REDIRECT EXAMINATION**

8 BY MR. PUTMAN:

9    Q.   Just so it's clear, Trooper Frazier, for the

10 record, the dog that DPS in Smith County has was in Waco

11 when you called for one on this traffic stop?

12   A.   Yes, sir.

13   Q.   And how far away is Waco from where you are on

14 the interstate?

15   A.   Several hours.

16   Q.   Several hours away?

17   A.   Yes, sir.

18   Q.   Not in Smith County?

19   A.   No, sir.

20   Q.   Tyler -- how far away is that from where you

21 were on the interstate?

22   A.   20 minutes.

23   Q.   And I believe that the dog, it was notified to

24 you, was on its way from Tyler?

25   A.   Correct, sir.

1    Q.    Tyler Police Department?

2    A.    Yes, sir.

3    Q.    Which is not the agency you work for?

4    A.    No, sir.

5    Q.    But it's another police agency here in Smith

6    County --

7    A.    Yes, sir.

8    Q.    -- that had a canine unit available?

9    A.    Yes, sir.

10    Q.    The mile marker that was on the ticket -- you

11    fill out tickets or warnings pretty frequently; is that

12    right?

13    A.    Yes, sir.

14    Q.    What mile marker do you put in on the ticket?

15    A.    I typically put -- well, we're supposed to put

16    the one where the traffic violation occurred.

17          A lot of times, in an instance like that, I

18    typically put the one where I'm at just because there's

19    a million things going on and sometimes I get confused

20    and --

21    Q.    If this -- in this situation, you testified

22    that you saw Mr. Pierce once cross over the white line

23    and another time right on top of the white line,

24    correct?

25    A.    Correct.

1    Q.   So that would be two different traffic

2  violations?

3    A.   Correct, sir.

4    Q.   Would you put both mile markers on the ticket?

5    A.   No, sir.  It's not possible.

6    Q.   What do you mean it's not possible?

7    A.   You can't put two different mile markers on

8  there.  They'll only take one.

9    Q.   Have to put one?

10   A.   Yes, sir.

11   Q.   The -- I think you testified on Monday, the --

12 really one of the first things Mr. Pierce said to you

13 was that his driver's license was suspended.

14   A.   Correct, sir.

15   Q.   What was the process you went through to figure

16 out if Mr. Pierce had a valid license to drive the

17 vehicle?

18   A.   I was going to have to run a driver's license

19 check out of the state that his driver's license was in

20 to find out if it was suspended or denied renewal or

21 what the deal was or what the reason that his driver's

22 license was suspended for.  Several of them are Class B

23 misdemeanors, you know, that are due to DWI or, you

24 know, for different reasons.  If they've been convicted

25 of DWI before.

1          So I wanted to look at the reason why his

2    driver's license was suspended or if he's been convicted

3    of it before.

4         Q.   Was that part of the conversation y'all had in

5    the car when you were also asking about what drugs or

6    illegal things might be in the vehicle?

7         A.   I talked to him first about his driver's

8    license, as well as outside the vehicle.

9         Q.   From Mr. Pierce's statements to you, were you

10   able to clearly identify whether or not his driver's

11   license was suspended or not?

12        A.   I believe so.  Yes, sir.

13        Q.   And what did you think?

14        A.   That it was suspended.

15        Q.   With a suspended license, would it be legal for

16   Mr. Pierce to get back in the car and drive the car?

17        A.   No, sir.  It was not.

18        Q.   Is that an offense you could arrest someone

19   for?

20        A.   Yes, sir.  It is.

21        Q.   Now, did you ultimately place Mr. Pierce under

22   arrest for the suspended driver's license?

23        A.   No, sir.  I did not.

24        Q.   Why not?

25        A.   Because I had something bigger to deal with

1 that, you know, I -- as far as the drug charges go.

2     Q.    After the events we've already been through and

3 you found what you believed to be methamphetamine, you

4 placed Mr. Pierce under arrest for that?

5     A.    Yes, sir.

6     Q.    Is that why you did not arrest him for the

7 driver's license?

8     A.    Yes, sir.

9     Q.    Now, is that an offense -- or do you know --

10 would you -- if you hadn't found anything illegal in the

11 car, would you have arrested him for the driver's

12 license suspension or written a ticket or a warning?  Do

13 you know what you would have done in that situation?

14     A.    I can't recall right now as far as the reason

15 why his driver's license was suspended.  But if it was

16 suspended for one of those things, then, yes, he would

17 have been placed under arrest due to intoxication, been

18 previously convicted of DWI before, things like that.

19     Q.    Depending on the underlying reason for the

20 driver's license suspension?

21     A.    Yes, sir.  Which I don't recall at this time.

22     Q.    And you don't remember what that was?

23     A.    Correct, sir.

24     Q.    And I guess it became less important to what it

25 was when you found the narcotics?

1          A.   Yes, sir.

2          Q.   I think you testified on Monday that one of the

3     things that made you suspicious specifically of

4     methamphetamine were the sores that you saw on Ms. Adams

5     and on Mr. Pierce?

6          A.   Correct, sir.

7                    MR. PUTMAN:   May I approach the witness,

8     Your Honor?

9                    THE COURT:   You may.

10         Q.   (BY MR. PUTMAN)   Trooper, I'm going to show you

11    what I've marked as 2S and 3S and have you look at

12    those.

13                   Do you recognize what's depicted in 2S and

14    3S?

15         A.   Yes, sir.

16         Q.   And do these pictures truly and accurately

17    depict what they purport to represent, that being

18    Ms. Adams and Mr. Pierce on the day you arrested them?

19         A.   Yes, sir.

20         Q.   And are you able to see the sores that you

21    testified to in State's 2S and 3S?

22         A.   Yes, sir.   On their face.   They also had them

23    on their arms as well.

24         Q.   These would just be pictures of the face?

25         A.   Correct.

1      Q.   But the ones you saw on the face, you're able

2    to see on State's 2S and 3S?

3      A.   Yes.

4           MR. PUTMAN:   Your Honor, at this time we

5    would offer State's 2S and 3S for the purpose of this

6    hearing.

7           MR. ELLIS:   No objection.

8           THE COURT:   State's 2S and 3S are admitted

9    without objection.

10          MR. PUTMAN:   May I put them on the ELMO,

11   Your Honor?

12          THE COURT:   You may.

13     Q.   (BY MR. PUTMAN)   All right.   It's always a

14   little harder to see the pictures on the ELMO because

15   there's a glare.

16          But can you identify on this picture --

17   this is State's 2S.   This is Ms. Adams, right?

18     A.   Correct, sir.

19     Q.   And when you said that the sores that you

20   believed were caused by methamphetamine use -- can you

21   kind of touch on your screen where you're talking about?

22     A.   There.   It's not exactly accurate where I'm

23   pointing to, but there.   And then you can see, like,

24   scars that used to be there on her face --

25     Q.   All right.

1      A.   -- as well.

2      Q.   And in your training and experience, these were

3   sores indicating methamphetamine use?

4      A.   Yes, sir.

5      Q.   And if you'll touch -- I'll do it.  It erases

6   everything.

7           This is 3S.  You can see sores like that on

8   Mr. Pierce?

9      A.   Yes, sir.

10     Q.   And could you touch where those are?

11     A.   (Complies.)

12     Q.   Now, obviously, when you were talking to

13  Mr. Pierce in his vehicle and in your vehicle and

14  Ms. Adams in their vehicle and in your vehicle, you

15  could see that -- their faces better than you can in the

16  pictures?

17     A.   Correct, sir.

18     Q.   They were moving their head side to side.  You

19  didn't have just one straight shot?

20     A.   Yes, sir.

21     Q.   Okay.  And you saw them in different lighting

22  conditions?

23     A.   Yes, sir.

24     Q.   Is there a difference to you between--in the

25  training and experience you've had--what would just be

1 normal skin problems, acne and things like that, versus

2 sores from methamphetamine use?

3     A.    Yes, sir.

4     Q.    Could you kind of describe for us what the

5 difference is?

6     A.    Typically acne will have heads on it.  The sore

7 from a meth sore does not.  The reason for that is they

8 pick at their skin and they break their skin open.  Not

9 just on their face, but like I said, on their arms,

10 also.

11            I typically don't see acne on people's arms

12 very much.  I know it can happen.  But to that degree,

13 I've never seen that before.

14     Q.    And the sores, I think you testified, you saw

15 on their face, you also saw on their arms?

16     A.    Correct, sir.

17     Q.    All right.  In your -- would you say

18 Interstate 20 is a fairly busy roadway?

19     A.    Yes, sir.

20     Q.    Lot of traffic on it?

21     A.    Yes, sir.

22     Q.    Certainly many, if not most, people on

23 Interstate 20 are there for legitimate reasons?

24     A.    Yes, sir.

25     Q.    In your training with the interdiction training

1    and drug training you've had, does Interstate 20 have

2    any particular significance as far as drug trafficking

3    and things like that?

4        A.   It leaves out of Dallas, so it leaves from a

5    known drug destination.  And it travels across the

6    United States, you know, eventually to Atlanta.  So it

7    goes to a known drug destination as well.  So yes, sir.

8        Q.   What's a known drug destination?  What does

9    that mean?

10       A.   Large cities where they ship drugs -- drugs are

11   either shipped to or shipped to other locations from

12   that location.

13       Q.   When you -- I think Mr. Ellis asked you on

14   Monday, you pull people over for lots of different

15   reasons?

16       A.   Yes, sir.

17       Q.   All right.  Every time you pull someone over,

18   are you suspecting them of trafficking narcotics?

19       A.   No, sir.

20       Q.   How about every time you pull someone over for

21   driving on an improved shoulder?

22       A.   No, sir.

23       Q.   I think you testified in this case it was the

24   things that you noticed after you made contact with the

25   driver and passenger that made you suspicious of that?

1      A.   Yes, sir.

2      Q.   The factors that they demonstrated and you've

3    testified to, did the fact that it was on the interstate

4    add to that at all?

5      A.   Yes, sir.

6      Q.   How so?

7      A.   The fact that it's -- the interstate runs from

8    Dallas, which is a known drug destination, and goes

9    across the United States.

10     Q.   Okay.

11     A.   You know, it's not something I -- you know, I

12   constantly think of when I stop every single person.

13   But it is something, you know -- the totality of the

14   circumstances, that it's also a part of that.

15     Q.   Being on the interstate on its own is not

16   necessarily suspicious?

17     A.   Correct.

18     Q.   But added in to the other factors that you

19   observed after you made contact with the driver and the

20   passenger?

21     A.   Yes, sir.

22     Q.   Okay.

23          MR. PUTMAN:  We pass the witness.

24          THE COURT:  Mr. Ellis?

25          MR. ELLIS:  Your Honor, permission to

1  approach the witness again?

2          THE COURT:  You may.

3          MR. ELLIS:  Thank you.

4                    **RECROSS-EXAMINATION**

5  BY MR. ELLIS:

6      Q.   Trooper, this is your report?

7      A.   Yes, sir.

8      Q.   Okay.  I'll flip to this page.  What does this

9  page mean?  The numbers on it.

10     A.   It looks like one of the cover sheets for his

11 -- just his information.  I'm not sure if it's for a

12 driver's license or what this exact page is as far as --

13     Q.   One moment here.  Let me show the State so they

14 know --

15     A.   Okay.

16     Q.   What does this indicate here?

17     A.   Where it --

18     Q.   Is there a time?

19     A.   Right here?

20     Q.   Right here.  We have a D-R.  What does that

21 mean?

22     A.   I have no idea.

23     Q.   You don't?

24     A.   No, sir.  I do not.

25     Q.   And right.  Here we have a time and date?

1     A.   Yes, sir.

2     Q.   That's not where you're running the license

3 plate or driver's license?

4     A.   I can't recall.  I don't know if that's where I

5 did that or what time they ran this in the office and

6 printed it out.  I'm not sure.

7     Q.   What time is that there?

8     A.   It's 23:22.

9     Q.   What time is that nonmilitary time?

10    A.   That would be 11:22.

11    Q.   11:22 p.m.  All right.  And the date?

12    A.   It's 2/21.

13    Q.   2013?

14    A.   Yes, sir.

15    Q.   All right.  And the shift you were working that

16 day?

17    A.   Can I look at my report?

18    Q.   Here you go.

19    A.   12:00 P. to 1:00 A.

20    Q.   All right.  So this is before your shift?

21    A.   Okay.

22    Q.   Right?  I'm asking you.  11:20-something is

23 going to be before midnight, right?

24    A.   Yes, sir.

25    Q.   All right.  Can you explain that?

1          THE COURT:  Mr. Ellis, 12:00 p.m. is noon.

2          MR. ELLIS:  I misspoke.  Thank you,

3     Your Honor.

4     Q.  (BY MR. ELLIS)  This is before midnight or

5     12:00 a.m.

6     A.  Okay.  Let's see.  I stopped him at 12:17.  So

7     that was on the 22nd.  I have no idea.  I really don't

8     know.  I've never met Mr. Pierce prior to this, so --

9     Q.  That's fine.

10    A.  -- I can't say.  I don't know if there was a

11    time difference on the computers or what the deal was.

12    Q.  And with the tickets, I believe you testified

13    that you're supposed to write down the mile marker where

14    it happened, right?

15    A.  Typically.  Yes, sir.

16    Q.  Okay.  And so can you -- you can't testify

17    certainly about whether or not you put down the mile

18    marker where it happened or the mile marker where you

19    stopped him, right?

20    A.  As far as the 548, he didn't -- we didn't even

21    stop until 548.  We stopped more like 547.  548 is going

22    to be east of 110.  So it's just a mistake on my -- on

23    my part because we weren't even at the 548 yet.

24          There's a million things going on when

25    something like that happens and sometimes I just put the

1   wrong number in there and --

2       Q.   Okay.  And would it also be fair to say that

3   the reason that you had for detaining Mr. Pierce longer

4   than necessary to write the ticket or a warning, you

5   assessed those up until the point that you told him you

6   were going to get a drug dog out there, right?

7       A.   Yes, sir.

8       Q.   And in your own determination after that point,

9   you may have found more reasons in your mind to detain

10  him, but you had already detained him at that point?

11      A.   Yes, sir.

12                  MR. ELLIS:  Pass the witness.

13                  THE COURT:  Mr. Putman?

14                  MR. PUTMAN:  No further questions.

15                  THE COURT:  Before Trooper Frazier leaves,

16  Mr. Putman, exactly what statute are you relying on in

17  the Transportation Code?

18                  MR. PUTMAN:  I don't have my Transportation

19  Code down here, Your Honor, for the number.

20                  THE COURT:  I mean, I have the one I think

21  it is, but...

22                  MR. ELLIS:  I have it right here.

23                  THE COURT:  Is it .058, driving on the

24  improved shoulder?

25                  MR. PUTMAN:  I believe that's it,

 1  Your Honor.  I looked it up prior to the hearing, but I
 2  don't recall the number.
 3           THE COURT:  It's your tail.  Do you know
 4  what it is?
 5           MR. ELLIS:  I do, Judge.
 6           THE COURT:  .058?
 7           MR. ELLIS:  545.058, I believe.
 8           THE COURT:  Okay.  Thank you.
 9           All right.  Any objections to
10  Trooper Frazier being excused?
11           MR. ELLIS:  No, your Honor.
12           THE COURT:  All right.
13           Thank you, sir.  You're finally excused.
14           (Witness leaves the courtroom.)
15           MR. PUTMAN:  State would call Josh Hill.
16           (Witness enters the courtroom.)
17           THE COURT:  Good morning, Officer Hill.
18           THE WITNESS:  Good morning, Judge.  How are
19  you, ma'am?
20           THE COURT:  Just fine.  You were previously
21  sworn as a witness, right?
22           THE WITNESS:  Yes, ma'am.
23           THE COURT:  You remain under oath.  Do you
24  understand?
25           THE WITNESS:  Yes, ma'am.

1    THE COURT:  Thank you.  Please have a seat

2  and state your name into the microphone.

3    THE WITNESS:  My name is Josh Hill.

4    THE COURT:  Thank you very much.

5    Officer Hill, you can push your hand under

6  the microphone and -- there you go.

7    All right.  Mr. Putman, your witness.

8                    **DIRECT EXAMINATION**

9  BY MR. PUTMAN:

10    Q.   How you doing today, Officer Hill?

11    A.   I'm good, sir.  And yourself?

12    Q.   Doing okay.  Who do you work for?

13    A.   City of Tyler Police Department.

14    Q.   Are you a certified peace officer?

15    A.   Yes, sir.

16    Q.   How long have you been a certified peace

17  officer?

18    A.   Six years yesterday.

19    Q.   And how long have you worked for the City of

20  Tyler Police Department?

21    A.   Six years yesterday.

22    Q.   And what do you do for the City of Tyler?

23    A.   Currently I'm assigned to the canine unit.

24    Q.   What does it mean to be in the canine unit?

25    A.   I'm responsible for handling a narcotics dog,

1  constant training in narcotics, assisting our vice and

2  narcotics units and different agencies, and we focus on

3  the complaint areas within the city that are provided by

4  the citizens.

5       Q.   How long have you been a canine unit?

6       A.   I believe since February of 2011.

7       Q.   February of 2011?

8       A.   Yes.

9       Q.   What did you -- what kind of -- in addition to

10  the peace officer training that you have, what kind of

11  additional training did you have to have to become a

12  canine officer?

13      A.   Initially it started as a board.  Going against

14  different officers with different knowledge of case law,

15  narcotics laws.

16           And once I won the board, I took my canine

17  partner to U.S. Canine in Kaplan, Louisiana where

18  we attended a -- basically it's a beginner's handler's

19  course for 6 weeks.

20           And upon doing that course, the school does

21  narcotics training, tracking training, just basic -- I

22  guess an entry level to someone who's handling a police

23  dog or police service dog to get them proficient enough

24  to where when they go out on the street that they're

25  certified and capable of doing such.

1     Q.   Did you complete that course?

2     A.   Yes.

3     Q.   Did you get a certification for completing that

4  course?

5     A.   Yes.

6     Q.   Is that the only course you've had regarding

7  canine dogs and handling things like that?

8     A.   No, sir.  We do -- we do several different

9  training sessions.

10           My partner, Officer Black, and I go to

11  several different schools, training conferences.  We're

12  also members of the National Narcotic Detective Dog

13  Association or the NNDDA where we do annual

14  certifications.

15           And there's different certifying officials

16  from all over the nation from the different law

17  enforcement agencies.  And when we get together

18  annually, we also do another certification.

19     Q.   So what certifications do you currently have?

20     A.   My canine partner, whose name is Vaio -- that's

21  V-A-I-O.

22           Vaio and I are certified through -- as a

23  team through U.S. Canine in Kaplan, Louisiana, and also

24  the National Narcotic Detector Dog Association.

25     Q.   And what kind of dog is Vaio?

1    A.   He is a full-blood Labrador.

2    Q.   And the -- Vaio is certified by these two

3  different agencies to do what?

4    A.   To detect the odor of narcotics.

5    Q.   What narcotics specifically is Vaio certified

6  to detect?

7    A.   Marijuana, cocaine, heroin, methamphetamine,

8  and ecstasy.

9    Q.   Any other substances, illegal or legal, that

10  Vaio is certified to be able to detect?

11    A.   No, sir.  That's it.

12    Q.   Just those?

13    A.   Yes, sir.

14    Q.   And what's -- what's the process there for --

15  how does -- how do you as a handler and Vaio as a dog

16  work together to do a search?

17    A.   It depends on what it is.  If it's, like, a --

18  are we going based on searching a vehicle?

19    Q.   Sure let's take a vehicle for example.

20    A.   Using a vehicle as an example, what I'll do is

21  I'll get Vaio out on lead.  And when I say on lead, it's

22  basically the leash is attached to his collar.  And I'll

23  just walk around and give him the command -- which it's

24  in Dutch.  It's called sook.

25            Once I give him the command to sook, it

1  means he starts to scan and smell the different parts of

2  the vehicle.  Whether it be all of the -- basically, to

3  put it in layman's terms, I'll start at one point of the

4  vehicle and I'll go front to back and I'll circle the

5  vehicle twice and then let him use his olfactory senses

6  or his nose to see if he can catch an odor that's

7  emitting from the exterior of the vehicle.

8        Q.   So I guess to begin a search I have to give

9  your dog a command to search?

10       A.   Yes.

11       Q.   He's not just searching all the time?

12       A.   No.

13       Q.   All right.  This -- since you did the handler's

14  course with your dog in 2011 and you've done these other

15  certifications, what kind of training do you do with

16  your dog in the meantime?

17       A.   Our canine unit, we try to train -- get at

18  least 8 hours of training in every week.  We try to do

19  it every Tuesday.

20             But that varies depending on what our vice

21  unit's doing or other agencies who may be needing help

22  with us.  It all kind of depends, but we try to do it

23  every Tuesday.

24       Q.   And do you keep records of that training?

25       A.   Yes.

1    Q.   And you've been able to keep up with your's and

2    Vaio's training since February of 2011?

3    A.   Yes.

4    Q.   Now, as a canine officer for the City of Tyler,

5    do you only search areas in the City of Tyler?

6    A.   No.  We -- according to the Code of Criminal

7    Procedure, we can actually go anywhere in Smith County.

8         But no, I do a lot of assists with DPS.

9    I've helped Smith County, Overton Police Department, and

10   I believe White House Police Department.

11   Q.   Is Tyler fairly centrally located in Smith

12   County?

13   A.   Yes, sir.

14   Q.   Convenient for you to be able to drive to other

15   areas of the county if they need you?

16   A.   Yes, sir.

17   Q.   How does Vaio let you know if--is it a he?

18   A.   Yes.

19   Q.   --if he detects one of the narcotics or illegal

20   drugs that he's certified to detect?

21   A.   Vaio is what they call an aggressive alert dog,

22   which means that he scratches.  The dogs that are

23   passive will sit down.  But Vaio is an aggressive, so

24   that means he scratches.

25   Q.   And where does he scratch?

1     A.   It depends on where he picks up the odor.  Then

2  he'll put his nose on it and that's where he scratches

3  with his front paws.

4     Q.   I think you said you give the command to search

5  and you circle a vehicle a couple of times.  When Vaio

6  scratches, what do you do?

7     A.   Once he scratches, that tells me that he's

8  picked up the odor of whatever narcotic -- or the

9  presence of the odor of the narcotic it may be and then

10  what I will do is give him his reward.

11         It's just a rubber ball, but to him -- I

12  mean, it's the greatest thing in the world to him.

13  That's his reward.

14     Q.   Okay.  He likes getting it?

15     A.   Yes.

16     Q.   And you did that after the dog alerts?

17     A.   Only if he alerts.

18     Q.   Only if he alerts?

19     A.   Yes.

20     Q.   And is that how you're trained to handle a dog

21  when he does a search?

22     A.   Yes.

23     Q.   To reward if there's an alert?

24     A.   Yes.

25     Q.   In your training and in your experience with

1  Vaio since 2011, did you say Vaio is reliable?

2      A.    Absolutely.

3      Q.    As far as detecting drugs?

4      A.    Yes.

5      Q.    And he's certified to do that?

6      A.    Yes, sir.

7      Q.    On February 22nd did you have an occasion to be

8  called out to the interstate to assist DPS with Vaio?

9      A.    Yes, sir.

10     Q.    Okay.  And do you recall how that came about?

11     A.    I was on duty at the time.  I believe my own

12 report says it was around a little after midnight or

13 almost 1 o'clock.  It was 12:40 in the morning when I

14 got -- was notified by dispatch to go up there and help

15 Trooper Frazier.

16     Q.    You were on duty?

17     A.    Yes.

18     Q.    And when you're on duty is Vaio with you?

19     A.    Yes.  Off duty as well.

20     Q.    On duty and off duty?

21     A.    Yes.

22     Q.    When you're on duty, where is Vaio?

23     A.    If you can imagine, think of a Tahoe.  The

24 Tahoe's actually cut up into thirds.  You've got the

25 driver's seat, the passenger's seat, and behind me the

1    car is divided in half, and half is his kennel.

2        Q.    He's got a kennel in the back of your SUV?

3        A.    Yes, sir.

4        Q.    So when you're on duty, you're driving around

5    in your Tahoe with Vaio?

6        A.    Yes.

7        Q.    So when you got the call to go to the

8    interstate, what did you have to do to get out there?

9        A.    Well, I notified dispatch where I was going

10   and, of course, I drove the SUV with Vaio in there with

11   me to the location where they were at.

12       Q.    Do you know about how long it took you to get

13   out there?

14       A.    I couldn't really -- really give you a

15   guesstimate because I don't remember exactly what part

16   of Tyler I was in.  But it was probably within 20 --

17   20 minutes.

18       Q.    When you got to the interstate, where did you

19   go specifically?

20       A.    It was at the eastbound mile marker at 547.

21       Q.    Okay.  And what did you do when you got there?

22       A.    I briefly spoke with the trooper.  And then

23   after that, I went to my vehicle and deployed Vaio and

24   let him conduct his free air sniff of the vehicle.

25       Q.    Did he do it the way that you testified that

1  Vaio's trained and certified to do it?

2      A.   Yes.

3      Q.   And did Vaio alert?

4      A.   Yes.

5      Q.   How many times?

6      A.   I believe it was three times.  Yes, three

7  times.

8      Q.   And what did that indicate to you, in your

9  training and certification?

10     A.   That there was the presence of a narcotic odor

11 inside the vehicle.

12     Q.   Did -- when you say a free air search of the

13 vehicle, where did Vaio actually go?

14     A.   It's a free air sniff of the exterior of the

15 vehicle.  I think the way we approached it was I was

16 walking up to the front of the car, because generally if

17 we're facing traffic, I like to start at the front so

18 that way I can kind of keep an eye on him and traffic to

19 avoid getting hit by a car.

20          I think on the way up to the vehicle, he

21 stops on his own at the passenger door behind the

22 driver's seat.  And then he immediately goes in to what

23 we call JND, just a noticeable difference with his

24 breathing pattern and everything drastically changes.

25          You can tell on his demeanor, his

1 breathing, he's more focused.  And then once he stops

2 and he goes to a final spot by scratching with his front

3 paws, then that tells me that there's a narcotic odor

4 inside the vehicle.

5     Q.    It's probably obvious, but this is an odor that

6 Vaio can smell but you can't smell, right?

7     A.    Exactly.  His olfactory senses are ten times

8 better than any of us.

9     Q.    And in this case Vaio alerted to the car?

10     A.    Yes.

11     Q.    And did you inform the troopers that were there

12 at the scene of that?

13     A.    Yes.  Once I completed scanning the rest of the

14 vehicle, yes.

15     Q.    What do you do after the free air sniff is

16 done?

17     A.    I secure Vaio in the patrol car.  And then I

18 believe in this particular case, I went up there and I

19 stayed with the occupants of the vehicle while the

20 troopers conducted their search.

21     Q.    The troopers are the ones that conducted the

22 search?

23     A.    Yes.

24     Q.    And were you present when the suspected

25 substances were found?

1    A.   Yes.

2    Q.   And -- they were found in the passenger

3 compartment of the car?

4    A.   I believe -- yes.  If I remember correctly, it

5 was Trooper Baker that recovered the narcotics that were

6 found inside the vehicle.

7    Q.   The passenger compartment of the car, is that

8 the area of the car where Vaio alerted to?

9    A.   Yes.

10    Q.   Now, when Vaio alerts to -- say it's this case.

11 There's narcotics found in the passenger department of

12 the car.  Is Vaio only going to alert on the side in the

13 quadrant of the passenger department for where the

14 narcotics are found?

15    A.   It actually all depends on the -- if there's a

16 lot of wind and -- let's just say that if the narcotics

17 are on the driver's side and there's wind coming that's

18 blowing towards the passenger's side, he may not catch

19 it on the driver's side.

20           But once we get to the passenger's side and

21 the wind is pushing the odor through the vehicle or

22 whatever, then he may catch it on the driver's side.

23    Q.   If there's no wind at all, let's say the

24 narcotics are on the backseat passenger side, is Vaio

25 able to detect that in other parts of the passenger

1  department?

2     A.   Yes.  He -- if there's no wind -- just imagine

3  sitting in a car, smoking a cigarette.  Okay?  The smoke

4  is going to go throughout the car because it's somewhat

5  compressed inside the car.

6           So if we were going to sniff for

7  cigarettes, if I was capable to do that, then he could

8  pick it up just about at any point in the car because

9  the odor is through the entire -- or the inside of the

10 vehicle.

11          MR. PUTMAN:  We pass the witness.

12          THE COURT:  Mr. Ellis?

13                   **CROSS-EXAMINATION**

14 BY MR. ELLIS:

15    Q.   Good morning, Officer.

16    A.   Good morning, sir.

17    Q.   We don't know what Vaio alerted on, right?

18 Specifically?

19    A.   No, we do not.

20    Q.   And did you say your commands to Vaio are in

21 Dutch?

22    A.   Dutch/German.  Yes, sir.

23    Q.   Is that with all the drug dogs or just Vaio?

24    A.   I can't testify for other dogs.  But for mine,

25 yes.

1    Q.   How long have you worked with Vaio?

2    A.   I believe since February, 2011, is when I

3 picked him up.

4    Q.   So that's 2 and a half years?

5    A.   Yes, sir.

6    Q.   Does Vaio ever alert to vehicles and you don't

7 find illegal substances?

8    A.   Knock on wood, no.  I have not since I've had

9 him.

10    Q.   What about when other handlers had him?

11    A.   I can't testify on their behalf.

12    Q.   You don't know?

13    A.   No, sir.

14    Q.   So Vaio wants the ball, right?

15    A.   I can't testify on what he wants.

16    Q.   You already testified that he wanted the ball.

17    A.   No, I said that's how I reward him.

18    Q.   You said he likes the ball a lot.

19    A.   Well, that's his reward.

20    Q.   Well, he clearly enjoys getting the ball at the

21 end, right?

22    A.   Right.

23    Q.   When he scratches at the car, he gets the ball,

24 right?

25    A.   Yes.

1    Q.   So doesn't he have incentive to alert on

2 vehicles?

3    A.   No, because he doesn't alert on every vehicle

4 that we send him.

5    Q.   Okay.  What was the wind like that day?

6    A.   It was coming out of the east, northeast at 10

7 miles per hour.

8    Q.   And where were you when you got the call that

9 needed to be out there on I 20 when they needed you?

10    A.   As I testified previously, I don't recall

11 exactly where in the city I was at.

12    Q.   But you were in Tyler?

13    A.   Yes.

14    Q.   It's a bit of a drive to get out there?

15    A.   Yes, sir.

16    Q.   It's not in the City of Tyler anymore?

17    A.   No.

18          MR. ELLIS:  Pass the witness.

19          THE COURT:  Mr. Putman?

20          MR. PUTMAN:  No further questions.

21          THE COURT:  May this witness be finally

22 excused?

23          MR. PUTMAN:  Yes, Your Honor.

24          MR. ELLIS:  Yes, Your Honor.

25          THE COURT:  All right.  Thank you very

much, Officer Hill.

    THE WITNESS: Thank you.

    (Witness leaves the courtroom.)

    MR. PUTMAN: We don't have any further witnesses at this time, Your Honor.

    THE COURT: All right.

    Mr. Ellis?

    MR. ELLIS: One moment, Your Honor.

    THE COURT: Sure.

    MR. ELLIS: We rest.

    THE COURT: You rest?

    All right. Any argument from the State?

    MR. PUTMAN: Your Honor, the -- we're obviously asking you to deny the defense motion to suppress.

    The trooper in this case pulled Mr. Pierce over for a valid traffic offense. He had reasonable suspicion to believe that a traffic violation had occurred twice. He testified the first time crossing over the white line.

    Obviously we can't see that on video because the trooper was parked perpendicular to the highway. He had -- it makes sense because he had a reason to pull out behind that vehicle that he was parked perpendicular to. Many vehicles pass that he

1   doesn't pull out behind.  And then he pulls out behind

2   Mr. Pierce's vehicle, catches up, turns his lights on

3   after he observes the driving.

4           And I think he even testified on Monday

5   that he was initially concerned for the driving on the

6   shoulder because he thought they might have been sleepy

7   or on cell phones or perhaps intoxicated.

8           And he even asked them when he approached

9   the car initially, "Have you had anything to drink?"

10  Pretty quickly when he starts talking to Mr. Pierce and

11  Ms. Adams he suspects perhaps they have illegal

12  narcotics in their car.

13          He sees the high-level of nervousness, the

14  shaking of Ms. Adams' hands.  Much more nervous than

15  someone on a usual traffic offense.  He sees what he

16  believes to be meth sores, in his training and

17  experience, on the face.  And Mr. Pierce from the very

18  beginning gives him a reason to keep the detention

19  going.  He states his driver's license is suspended,

20  which would be something that Trooper Frazier could not

21  allow him to continue driving if that was the case.

22          He has him step out of the car and back

23  into his car.  He doesn't talk to him on the side of the

24  highway for safety reasons and for the cold.  And in the

25  process of checking him for any possible weapons before

he seats him in the car, because they're going to be so close in the car, he finds another indicator in his experience and training of methamphetamine use, which is wires and remotes inside his pocket.

He puts him in the car. He asks him a series of questions that he's been trained to ask about illegal things in the car, ending with the most -- the thing he most suspects is in the car.

And while he gets a direct no to the first set of questions, he gets a different kind of response to the last one, that being no. But a hesitation, a drop of the head, something that Trooper Frazier is trained to checked for.

It's on I 20 coming from the direction of Dallas, which is a known drug destination. And also the vehicle is registered to a third party. They're in Texas, reportedly driving to Louisiana with a car registered in Arkansas. That's another indicator of suspicious narcotic trafficking that Trooper Frazier testified to.

He asked for consent to search. He was denied. Then he goes and talks to Ms. Adams to let her know what's going to go on and then he receives more suspicion at that point because Ms. Adams gives a different reason for their trip than Mr. Pierce had.

1  She says they were visiting his family.  Mr. Pierce

2  indicated they were visiting her family.

3          At that point, after he talks to Ms. Adams,

4  he gets her out of the car, he secured the car, which he

5  has probable cause to believe it contains narcotics,

6  certainly reasonable suspension to continue detention.

7          He does call for the canine.  The DPS

8  canine was hours away in training.  So they contacted

9  the next closest agency that they knew had an available

10  drug dog, which is Tyler Police Department.

11          Then they wait about 20 minutes for the

12  drive.  I think the actual time elapsed from the stop,

13  which is at 45:57 in to the video, and the dog arrives

14  at 52 minutes, 30 seconds or thereabout and does the

15  search.

16          They had suspicion to detain them.  And

17  when the dog alerted, they had probable cause to search

18  the vehicle because the dog, who was certified to detect

19  narcotics, alerted that there were narcotics in the

20  vehicle.  And almost immediately thereafter, the vehicle

21  was searched and narcotics were found inside the

22  vehicle.

23          For that reason, Your Honor, we're asking

24  to not -- for the Court to deny the motion to suppress.

25  I believe the stop was based on reasonable suspicion.

1 The detention was for a reasonable amount of time.  The

2 trooper had plenty of suspicion to detain, waited for

3 the dog that was close and did not take an inordinate

4 amount of time to get there.  It was a reasonable amount

5 of time.  And when the dog alerted, they did a prompt

6 search and discovered what they believed to be

7 methamphetamine in the vehicle.

8             THE COURT:  Mr. Ellis, on behalf of the

9 defense?

10            MR. ELLIS:  Yes, Your Honor.

11            Your Honor, we think there are essentially

12 three reasons the Court should grant the motion to

13 suppress.

14            First, because the stop was unlawful.

15 Secondly -- and secondly, that the State has not proven

16 that the stop was a lawful stop.  And finally that the

17 detention was too long.

18            Your Honor, on the stop -- you have a lot

19 of testimony on it.  Essentially, the officer says there

20 were two incidents where he was driving on the improved

21 shoulder.

22            In fact, he goes as far to say that driving

23 on the white line is driving on the improved shoulder.

24 I think the case law I will present will contradict

25 that, Your Honor.

1        If we look at the reports, we look at the

2   video, we look at the testimony, what we find is

3   multiple statements from Trooper Frazier. He sees the

4   vehicle pass, pulls out, speeds up to him. And at this

5   point, as he testified to the Court, Mr. Pierce was

6   driving essentially halfway off the road and was able at

7   a high speed to correct that over what would just be a

8   matter of yards. And he didn't pull him over right

9   away. That's somewhat suspect, Your Honor.

10        But I think the reality is that

11   Trooper Frazier had a lot of things to do that evening.

12   And the most memorable event was probably finding over a

13   pound of methamphetamine.

14        But he prepares the report 5 days later.

15   And now we're months later and he's relying on the

16   report which he made in reliance on the video. And if

17   we look at his testimony and what he testified to based

18   on his report from that day, what we learn is that the

19   report says he saw him drive on the improved shoulder.

20   No more details than that. Doesn't say halfway off the

21   road, which I think would be noteworthy, Your Honor.

22   But he doesn't say that.

23        And he doesn't say specifically where it's

24   at, either. But he says the next thing he did was turn

25   on his overhead lights and pull the defendant over.

1  Well, that's exactly what we see in the video.  He

2  speeds up to him and waits behind him for some time,

3  which is an odd thing to do for a man he thinks is

4  halfway off the road, then he pulls him over after we

5  see him arguably bump the line a few times.

6              Judge, I would say, you know, it's like

7  tennis.  If you're not on the line, I think it's hard to

8  see whether or not he hit the line.  But arguably he

9  touched the line.

10              Your Honor, in any case, that's not driving

11  on the improved shoulder.  And I'll give the Court case

12  law on that.  But he pulls him over at that point.  But

13  the telling point is that he approaches the driver --

14  the passenger's side and says, "The reason I pulled you

15  over was for hitting that line a few times when I got up

16  behind you."

17              And then he even goes so far as to explain

18  why he thinks they might have done it.  "You were

19  probably looking over your shoulder at me."  It's a

20  really specific reason he uses to pull them over.

21              And if that's not enough, Your Honor, later

22  on in the video, after they've inventoried the vehicle

23  and arrested Mr. Pierce, Trooper Baker says, "What did

24  you get him for?"  And I'll submit you have to listen

25  closely, but the officer testified as much.  He says,

1   "Driving on the shoulder.  Yeah, I even said to him,

2   'You were probably looking over your shoulder at me.'"

3         So we have two separate episodes, two

4   statements by Trooper Frazier to different people.  He

5   really had no incentive to mislead them.  In fact, he

6   testified that he wasn't trying to mislead Mr. Pierce.

7   That was the conduct that amounted to driving on the

8   improved shoulder.

9         I think it stretches the imagination to say

10   that what it really was was something that's not

11   recorded on video--and I realize the video couldn't see

12   that the way the car was positioned--and something that

13   wasn't even noted in his report.

14         It seems a detail worth mentioning that the

15   car was halfway off the road.  But he doesn't say that,

16   Your Honor.  I think the reality is that troopers have

17   to prepare reports later, they have to testify later,

18   and maybe it's not typical for him to pull someone over

19   for that reason.  And he's thinking, "Surely there was

20   more.  I don't know."  But I don't believe the State's

21   met the burden as of yet.

22         Now, I know the State will argue, "Well, he

23   must have pulled out for some reason to pull Mr. Pierce

24   over."  But that's what trooper testified.  There's a

25   number of reasons he pulls out on people and then he

1 follows them.

2       I would submit to the Court that it's

3 certainly possible with an out of state car that doesn't

4 require a front license plate, that he pulled out when

5 he didn't see the front license plate, followed the

6 vehicle for some time.

7       When he realized it wasn't a Texas plate,

8 he found conduct that would be sufficient to pull him

9 over.  And at that point, Your Honor, he pulled him

10 over.

11       Now, in either case, Your Honor, whether

12 you believe that in fact Mr. Pierce's vehicle was

13 halfway off the road or that he hit the white line, I

14 have case law, Your Honor, here suggesting that a person

15 can cross the fog line, as it's known, and that not be

16 driving on the improved shoulder.

17       I think if you look at the statue we

18 referenced earlier, what we find is that it's not prima

19 facia evidence -- and I'll present this case to the

20 Court.  It's not prima facia evidence of this offence

21 that someone was simply crossing the line or on the

22 shoulder.

23       In fact, the State has to go further and

24 present evidence that it was either done unsafely, or

25 not in one of the seven enumerated reasons that a person

can cross over the line, which are in the statute. They
have to deal with passing a vehicle or avoiding a
collision.

　　　　　　　More to the point, Your Honor, if you look
at the case from the Court of Criminal Appeals, what
they'll say is, "It's not the burden of the defense to
defend our reasoning for having driven on the shoulder,
but rather the State has to prove he drove on the
shoulder and did so unsafely."

　　　　　　　There was no testimony, Your Honor, no
evidence that the driving on the shoulder, in either
incident, was done unsafely, other than a trooper
suggesting that whenever he sees someone weaving or
driving he always thinks about intoxication crimes.

　　　　　　　But he did not say specifically that in
this case he thought the defendant was intoxicated and
he didn't say that the actual conduct was unsafe.

　　　　　　　I'm sure the Court has had to deal with
failure to maintain single lane cases before. This is
very similar in that the trooper needed to testify that
the specific conduct was unsafe in that moment.

　　　　　　　For example, that he nearly struck
something on the side of the road or that he could cause
other vehicles to react. There's no evidence of that
kind.

1        So regardless of whether or not you think
2   it was the first incident or the second, which I would
3   submit he wasn't driving on the shoulder, the State
4   hasn't met the burden of proving that that was an
5   offense and so the stop should be suppressed.
6        Your Honor, when we look at the detention
7   -- this is really the final point.  The length of
8   detention for Mr. Pierce -- unfortunately there's no
9   bright line standard for the Court about how long
10  someone can be detained for a drug dog to come out and
11  search.
12       Rather, the Court has to look at -- the
13  Court has to look at the -- all the factors that went in
14  to it and whether or not the officer did all he could.
15  And I think what you'll find is that very quickly -- and
16  I have case law on this.  Very quickly in to the stop,
17  he determines he's going to need a drug dog.
18       In fact, he's in the vehicle and he says,
19  "You're within your right to refuse.  I'm within my
20  right to call the dog."  And, Your Honor, I would submit
21  at that point it's no longer relevant -- the points that
22  the State brings up that would amount to reasonable
23  suspicion.  Specifically, those would be finding the
24  remotes and the wires.  Those were found after that
25  point.  He's already detained Mr. Pierce.  He didn't

1   need those.  He's already detained him on the side of

2   the road.

3           The conflicting stories, which I would also

4   submit, had to do with the different way the question

5   was asked.  But in either case, those were developed or

6   discovered after he had decided to detain Mr. Pierce and

7   call a drug dog.

8           The real issues, Your Honor, the real

9   issues that would amount to the officer's reasonable

10  suspicion were nervousness, Mr. Pierce's head gesture in

11  the vehicle, and the sores on his body.  And,

12  Your Honor, that's the only -- that it's.

13          I believe those are the only facts -- other

14  than him driving from Dallas.  I would hope the Court

15  wouldn't conclude that anyone driving from Dallas,

16  eastbound on I 20, has at least one factor for

17  reasonable suspension of drug trafficking.

18          THE COURT:  Well, and let me ask you this.

19  As far as -- are you talking about the length of

20  detention?

21          MR. ELLIS:  Yes, Your Honor.

22          THE COURT:  All right.  Where do you think

23  the suspended license plays in that?

24          MR. ELLIS:  Your Honor, I think he has --

25  the officer has to take a reasonable amount of time to

1  resolve that issue and he ran the license right away.

2  But I think it's clear that he tells Mr. Pierce in the

3  car, "Well, at this point it's becoming a drug dog

4  search."  And he's now moved on to a new investigation.

5  And I don't know if the Court's asking me

6  if I believe that that is -- I think that he didn't need

7  anymore time to resolve that issue.  He testified, in

8  fact, that he came to believe the license was suspended

9  and he believed Mr. Pierce.

10  Frankly, if he wanted, he could have

11  arrested Mr. Pierce for that and he chose not to.  So I

12  don't suspect anything malicious on the part of the

13  trooper, but I do think he's relying a lot on memory a

14  long time later.

15  Your Honor, with respect to the specific

16  articulable facts that the trooper referenced, I would

17  say that nervousness is normal.  And I've got case law

18  that supports that.  That his head dropping down after

19  being repeatedly asked similar questions -- "Do you have

20  anything illegal?"  "No."  "Do you have this drug?"

21  "No."  "Do you have this drug?"  "No."  "Do you have

22  meth?"  "No."

23  I think there was a conversation there and

24  it's unfortunate that the trooper, by his own testimony,

25  forgot to record that for us.  And I would have liked to

1  have had the Court be able to review that since the

2  trooper relied on it so heavily and decided to detain

3  him on the side of the road.

4             Ultimately, Your Honor, we ask that the

5  Court grant the suppression because the stop was

6  unlawful and because the detention was too long.  It was

7  42 minutes.  He wasted 9 of those not even bothering to

8  call for a drug dog.  We think a suppression's granted,

9  Your Honor.

10             THE COURT:  Warranted.

11             MR. ELLIS:  Yes, Your Honor.

12             THE COURT:  All right.

13             Mr. Putman, on behalf of the State?

14             MR. PUTMAN:  Just briefly, Your Honor.

15             I think Mr. Ellis would be right that I

16  would have to prove that the defendant was not driving

17  on the shoulder for one of those seven reasons if I was

18  trying to convict him of driving on the shoulder.

19             But my burden is to show that the officer

20  had reasonable suspicion to pull the defendant over.

21  When he saw him driving on the shoulder, halfway on the

22  shoulder, he had a reasonable suspicion to pull him

23  over.

24             I'm not required to prove beyond a

25  reasonable doubt a violation of the law.  I'm required

1  to prove that the officer had reasonable suspicion that

2  a violation had been committed at the time.

3          The trooper testified he was halfway on the

4  shoulder.  He was suspicious and therefore he pulled him

5  over.  The fact he was halfway on the shoulder would be

6  reasonable suspicion that an offence had been committed.

7  I have case law that basically states that I'm not

8  required to prove all the elements of the offense, just

9  that there was reasonable suspicion to pull him over.

10          THE COURT:  Well, and I think Mr. Ellis is

11 referring to the Lothrop case from the Court of Criminal

12 Appeals.  Have you had an opportunity to review that

13 case?

14          MR. PUTMAN:  I haven't reviewed that

15 particular case, Your Honor.

16          THE COURT:  All right.  Why don't you take

17 a minute.  I'm going to read it carefully myself.

18          Mr. Putman?

19          MR. PUTMAN:  Your Honor, I read through the

20 Lothrop opinion, I guess.  And I guess it comes down to

21 the sentence, "Thus if an officer sees a driver driving

22 on an improved shoulder and it appears that the driving

23 on the improved shoulder was necessary to achieving one

24 of the seven approved purposes and it is done safely,

25 the officer does not have reasonable suspicion that an

1    offense occurred."  That seems to me to be the key point

2    regarding our issue today.

3              Two things I would point out.  First of

4    all, the second part of the sentence says, "If it

5    appears that the driving on the shoulder was necessary

6    to achieving one of the purposes."

7              I think that there would need to be

8    something in the record -- I'm not saying it's the

9    defendant's burden.  But something in the record that it

10   was for one of the seven approved purposes.

11             Those would be to stop, stand, or park;

12   accelerate before entering the main travel lane of

13   traffic; decelerate before making a right turn; passing

14   another vehicle that is slowing or stopped on the main

15   travel portion of the highway; to allow another vehicle

16   traveling faster to pass, as permitted or required by

17   the official traffic control advisor, or to avoid a

18   collision.

19             There's nothing in the record that would

20   make it appear that the driving on the improved shoulder

21   was necessary to achieving one of the seven purposes.

22             In addition to that, the trooper testified

23   that he's been trained in the traffic laws in the State

24   of Texas and that when he saw the defendant driving on

25   the shoulder he believed he was committing an offence.

1           I think that is evidence that he was not

2   doing it for one of these seven purposes because he

3   testified he'd committed a traffic violation when he saw

4   him do it.

5           He's obviously been trained in these seven

6   approved purposes and there's nothing in the record that

7   would indicate there was any of these seven approved

8   purposes that caused the defendant to drive on the

9   shoulder.

10           So I think that the reason for the traffic

11   stop, he had reasonable suspicion to believe an offense

12   had occurred because he saw the defendant driving

13   halfway on shoulder.  Nothing to indicate there was any

14   permissible purpose there next to the weigh station for

15   doing so.  In fact, the trooper testified that he was

16   breaking the law when he did it.

17           THE COURT:  All right.  Anything further

18   from the defense?

19           MR. ELLIS:  Your Honor, I just would add

20   that I think the State should -- I would agree that

21   there is nothing in the record detailing why

22   Mr. Pierce's vehicle was on the shoulder.

23           And he's right to look at page 5.  But I

24   think if you read the full paragraph there, Judge, what

25   it says is it begins with this idea that they can't

1 shift the burden and it ends with that there are express

2 reasons for such behavior.  It's the State's burden to

3 prove that one of those reasons -- what was not at

4 issue.  Just like in a failure to maintain single lane

5 of traffic safety case, they have to prove that he

6 didn't just fail to maintain a lane, but that it was

7 done unsafely.

8               There's no evidence to that, Your Honor.

9 And I don't think it's sufficient to say that the

10 trooper knows an offence when he sees it.  He's not a

11 legal expert.  I don't think he gave us different

12 versions of what he believes was driving on the improved

13 shoulder.  That's the Court's job to determine that.

14               THE COURT:  All right.  Anything further

15 from the State?

16               MR. PUTMAN:  No, Your Honor.

17               THE COURT:  All right.  We're going to be

18 in recess on this case.  The Court is taking this under

19 advisement.

20               Ms. Miller will send you-all a notice of a

21 setting for the Court's ruling.  Thank you.

22               MR. ELLIS:  Thank you, Your Honor.

23               THE DEFENDANT:  Thank you.

24               (Proceedings adjourned.)

25

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF SMITH    )


     I, Cassie Condrey, Official Court Reporter in and

for the 114th District Court of Smith County, State of

Texas, do hereby certify that the above and foregoing

contains a true and correct transcription of all

portions of evidence and other proceedings requested in

writing by counsel for the parties to be included in

this volume of the Reporter's Record, in the

above-styled and -numbered cause, all of which occurred

in open court or in chambers and were reported by me.

     I further certify that this Reporter's Record of

the proceedings truly and correctly reflects the

exhibits, if any, admitted by the respective parties.

     WITNESS MY OFFICIAL HAND this the 24th day of June,

2014.


                    _/s/Cassie Condrey_____
                    CASSIE CONDREY,  TX CSR #9035
                    Certification Expires: 12-31-14
                    Official Court Reporter
                    114th Judicial District Court
                    Room 212
                    Smith County Courthouse
                    Tyler, TX 75702
                    (903) 975-4331